**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| EPIC LANE NETWORKS, LP, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| VERIZON COMMUNICATIONS INC., | § | |
| CELLCO PARTNERSHIP d/b/a VERIZON | § | **JURY TRIAL DEMANDED** |
| WIRELESS, VERIZON BUSINESS | § | |
| NETWORK SERVICES LLC, and | § | |
| VERIZON CORPORATE SERVICES | § | |
| GROUP INC., | § | |
| | § | |
| Defendants. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Epic Lane Networks, LP files this Complaint for patent infringement against Verizon Communications Inc., Cellco Partnership d/b/a Verizon Wireless, Verizon Business Services LLC, and Verizon Corporate Services Group Inc. and alleges the following:

## THE PARTIES

1.      Epic Lane Networks, LP ("Epic Lane Networks") is a Texas limited partnership, located at 609 Castle Ridge Road, Suite 445, West Lake Hills, Texas 78746. Epic Lane Networks owns the patents asserted in this action.

2.      Verizon Communications Inc. ("Verizon Communications") is a publicly traded corporation formed and organized under the laws of Delaware with its principal executive offices and corporate headquarters located at 1095 Avenue of the Americas, New York, New York 10036.

3.      Verizon Communications does business throughout the United States, the state of Texas, and in this judicial district. Verizon Communications may be served with process through

its registered agent, The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19808.

4.      Verizon Communications is a "holding company that act[s] through its subsidiaries" and claims to be "one of the world's leading providers of communications, technology, information and streaming products and services to consumers, businesses and government entities." *Verizon 2024 Annual Report* at page 4.

5.      Cellco Partnership ("Verizon Wireless") is a Delaware partnership wholly owned by Verizon Communications. Verizon Wireless is registered to do business in Texas and conducts business on behalf of Verizon Communications as a subsidiary, affiliate, agent, and/or alter ego in the state of Texas and in this judicial district.

6.      Verizon Wireless provides mobile telecommunications services and products to customers in Texas and in this judicial district. Verizon Wireless may be served with process through its registered agent at CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

7.      Verizon Business Network Services LLC ("Verizon Business Network Services") is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 22001 Loudoun County Parkway, Ashburn, Virginia 20147. Verizon Business Network Services is a subsidiary of Verizon Communications and is registered to do business in Texas. Verizon Business Network Services may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

8.      Verizon Business Network Services provides telecommunications and networking products and services including virtual private network, unified communications, and managed network services to customers in Texas and in this judicial district.

9.      Verizon Corporate Services Group Inc. ("Verizon Corporate Services Group") is a corporation organized and existing under the laws of the State of New York with a principal place of business at One Verizon Way, Basking Ridge, NJ 07920. Verizon Corporate Services Group may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136.

10.     Cellco Partnership d/b/a Verizon Wireless, Verizon Business Network Services LLC, AND Verizon Corporate Services Group Inc. are directly or indirectly wholly-owned by Verizon Communications Inc.

11.     Verizon is doing business directly or through its agents, affiliates, or subsidiaries in this judicial district and throughout Texas and the United States.

12.     Verizon has "two reportable segments that [it] operate[s] and manage[s] as strategic business units - Verizon Consumer Group (Consumer) and Verizon Business Group (Business)." *Verizon 2024 Annual Report* at page 4.

13.     Verizon Consumer Group "provides consumer-focused wireless and wireline communications services and products," including "fixed wireless access (FWA) broadband through our fifth-generation (5G) or fourth-generation (4G) Long-Term Evolution (LTE) networks as an alternative to traditional landline internet access." *Verizon 2024 Annual Report* at 4. These wireless services are provided via Verizon's "extensive wireless networks in the United States (U.S.) under the Verizon family of brands and through wholesale and other arrangements." *Id*.

14.     Verizon Business Group "provides wireless and wireline communications services and products, including FWA broadband, data, video and advanced communication services, corporate networking solutions, security and managed network services, local and long distance

voice services and network access to deliver various Internet of Things (IoT) services and products." *Verizon 2024 Annual Report* at 4.

15.     Verizon Business Group provides 5G communication services to enterprise and public sector customers through a portfolio of network connectivity products. *Verizon 2024 Annual Report* at 5. "These products include internet access services, private networking services, private cloud connectivity services and virtual and software defined networking services." *Id*. In 2024, Verizon's enterprise and public sector revenues represented approximately 48% of Verizon Business's total revenues.

16.     Verizon Communications has registered various other subsidiaries to do business on its behalf in Texas including: Verizon Online LLC, Verizon Sourcing LLC, Verizon Connect Inc., Verizon Innovation Inc., Verizon Wireless Network Procurement LP, Verizon Services Corp., and Verizon Wireless Services LLC. These Verizon entities conduct business in Texas as subsidiaries, affiliates, agents, and/or alter egos of Verizon Communications.

17.     Defendant Verizon Communications and its subsidiaries, including Verizon Wireless, Verizon Business Network Services, and Verizon Business Network Services, are herein collectively referred to as "Verizon."

## JURISDICTION AND VENUE

18.     Epic Lane Networks repeats and re-alleges all preceding allegations as though set forth here in their entirety.

19.     This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

20.     This Court has personal jurisdiction over Verizon consistent with due process and the Texas Long Arm Statute because Verizon has minimum contacts with Texas and this judicial

district such that this is a fair and reasonable venue. Verizon conducts substantial business in (and with) the State of Texas and in this district, including (a) their infringing conduct alleged herein and (b) regularly doing or soliciting business, engaging in other persistent conduct targeting residents of Texas and this district, and/or deriving substantial revenue from infringing products and services provided to and targeting Texans and residents of this district. This action arises in part from Verizon's contacts with and conduct in Texas and this district.

21.     Verizon derives benefits from its presence in this federal judicial district, including, but not limited to, generating sales revenue and serving customers using its mobile network in this district, selling products and services from its corporate retail locations in this district, operating cellular and broadband network infrastructure in this district, and providing network access and broadband services to residents of this district.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(b) because Verizon has committed acts of infringement in this district and maintains established and regular places of business in this district.

23.     Verizon has offices, including for its network technology and planning group, and operates at multiple locations in this district where Verizon employees and/or agents develop, manufacture, test, store, distribute, offer for sale, and sell Verizon products and services.

24.     Verizon owns or controls property, inventory, and infrastructure in this district.

25.     Verizon's website provides information for retail stores in this district (www.verizon.com/stores/).

26.     Verizon maintains an established place of business at 1006 E. End Blvd. N, Ste A, Marshall TX 75670 (*see* https://www.verizon.com/stores/details/texas/marshall/victra-marshall-tx-a00000256847/).



27.    Verizon maintains an established place of business at 741 N Central Expy, Plano, TX, 75075 (*see* https://www.verizon.com/stores/details/texas/plano/east-plano-r00000238048/).



28.    Verizon maintains an established place of business at 204 Central Expy S, Ste 40, Allen, TX, 75013 (*see* https://www.verizon.com/stores/details/texas/allen/your-wireless-allen-a00000257434/).



29.    Verizon operates a distribution and warehouse facility located at 1753 Chaplet Drive, Haslet, Texas 76247 (*see* https://www.dentoncad.com/property-detail/976841/2026), and a Verizon Business Service location at 5020 E State Highway 121, The Colony, Texas 75056 (*see* https://www.verizon.com/business/locations/tx/the-colony/5020-state-highway-121-2354739).



30.    Verizon has and continues to commit acts of infringement, induce, and contribute to infringement by subsidiaries, partners, affiliates, and end users in this district including by selling,

offering for sale, and using (including through testing) products and services that infringe the asserted Epic Lane Networks patents.

31.     Verizon has not contested venue in prior patent infringement actions in this district and has admitted to offering wireless products and services for sale in this district.

## THE EPIC LANE NETWORKS PATENTS

32.     The asserted Epic Lane Networks patents are directed to revolutionary advances in network function virtualization and software-defined networking that Verizon has adopted in its 5G network offerings.

33.     The Epic Lane patents describe and claim groundbreaking technologies that originated at Adaptive Spectrum and Signal Alignment, Incorporated (ASSIA).

34.     ASSIA focuses on fundamental research and development of innovative technologies that benefit the telecommunications industry and improve network connectivity worldwide.

35.     ASSIA's history is marked by development of innovative technologies adopted by telecommunications providers worldwide. ASSIA's market-leading solutions enable faster, more efficient data communication by optimizing infrastructure performance.

36.     The inventors of the subject matter claimed in the asserted patents include Dr. John Cioffi and Dr. Ken Kerpez. Dr. John Cioffi was a tenured endowed professor at Stanford University in the Department of Electrical Engineering from 1985 to 2009, where he is now an active Professor Emeritus.

37.     Dr. Cioffi is a prolific inventor whose work in research and industry has been instrumental in advancing modern telecommunications. He has published over 400 papers, and the United States Patent and Trademark Office has issued over 100 patents claiming his inventions.

38.     Dr. Cioffi has been recognized with numerous prestigious awards and honors for his contributions to technology and industry. He is a member of the United States National Academy of Engineering and an International Fellow of the United Kingdom Royal Society of Engineering. In 2013, Dr. Cioffi was inducted into the Internet Hall of Fame and in 2023 was presented with the National Medal of Technology and Innovation.



Dohrn, Gillian, *Stanford Engineer John Cioffi Receives National Medal of Technology and Innovation*, *Stanford Report* (Oct. 24, 2023), https://news.stanford.edu/stories/2023/10/john-cioffi-receives-national-medal-technology-innovation.

39.     Among his inventions, Dr. Cioffi pioneered the use of remote management algorithms to improve both wireline and wireless physical-layer transmission performance, an area often known as Dynamic Spectrum Management. Dr. Cioffi has also worked in video technology and is credited with contributing to the creation of video calls and high-speed Internet.

40.     Dr. Kerpez received his Ph.D. in EE communications from Cornell University in 1989. Prior to his work at ASSIA, he worked at Bellcore and Telcordia for over 20 years. Dr. Kerpez became an IEEE Fellow in 2004 for his contributions to broadband. He has published over 100 papers and has made over nine hundred standards contributions in wireline and broadband data technology fields. Dr. Kerpez has many years of experience working on communications systems and networks of all sorts, including DSL, fiber access, home networks, IP QoS, triple-play services, Virtualization, 5G, and Wi-Fi.

41.     Other inventors listed on the Patents-in-Suit include Marc Goldburg, an IEEE Fellow who has been awarded the Scientific American Communications Researcher of the Year. He holds a Ph.D. in Electrical Engineering from Stanford University. Philip Bednarz, who also holds a doctorate in Electrical Engineering from Stanford University, has extensive experience in the telecommunications industry.

**The Asserted Patents**

42.     By this Complaint, Epic Lane asserts that Verizon infringes:

- U.S. Patent No. 10,050,846 (the "'846 patent");

- U.S. Patent No. 10,924,359 (the "'359 patent");

- U.S. Patent No. 11,843,520 (the "'520 patent");

- U.S. Patent No. 11,695,588 (the "'588 patent");

- U.S. Patent No. 12,335,092 (the "'092 patent");

- U.S. Patent No. 11,924,059 (the "'059 patent"); and

- U.S. Patent No. 11,082,305 (the "'305 patent").

43.     On October 15, 2024, ASSIA assigned the asserted patents and Application No. 17/408,491, which later issued as the '092 patent, to Epic Lane Networks, and Epic Lane Networks

recorded the assignment at the United States Patent and Trademark Office on May 8, 2025 (Reel/Frame 071060/0333).

### The '846, '359, and '520 patents

44.    The '846, '359, and '520 patents, titled "Device Abstraction Proxy," claim priority to November 2, 2009, and are directed to systems and methods for implementing and operating device abstraction proxies, and in some embodiments a management entity, for instantiation of virtualized physical access aggregation devices to configure, manage, and operate communication network resources.

45.    Conceiving an access network architecture featuring a device abstraction proxy, inventors Goldburg and Bednarz overcame technical challenges then existing in the state of the art that prevented efficient utilization, allocation, and management of network resources. Logical access aggregation networks with configurable service definition rules enabled the instantiation of multiple user domains with varying service levels that are dynamically created and managed to deliver network services to meet demand while minimizing overhead and complexity associated with managing network devices individually.

46.    The inventors recognized that the claimed subject matter provided benefits to service providers including wireless operating companies and internet service providers. '846 patent at 6:20-31.

47.    The '846 patent describes and claims systems and methods featuring virtual access aggregation devices and a centralized management system communicatively interfaced to multiple access aggregation devices. Through the centralized management system, operational data relating to broadband communication services is requested, received, and used to instantiate and allocate network resources via virtual access aggregation devices associated with a broadband service

provider. The centralized management system receives a request via a control interface to manage logical ports associated with remote broadband terminals, provide granular administrative authority for provisioned virtual network access aggregation devices, and enforce operational constraints.

48.     '846 patent Figure 1A describes an exemplary architecture for the inventions claimed:



49.     The '359 patent describes and claims a network management system and methods for providing a virtual access network to support logical aggregation networks (i.e., network slices) having certain network characteristics that comply with service definition rules.

50.     By implementing a management entity that creates virtual access aggregation devices related to physical aggregation devices, the inventions claimed in the '359 patent enable, among other benefits, enforcement of traffic rules on logical access networks, provision of specific

network capabilities and characteristics, and reporting of diagnostic information for logical network slices that traverse a wide area network.

51.    Figure 4 of the '359 patent illustrates an exemplary system in which the claimed subject matter may be installed, operated, configured, and integrated:



52.    The '520 patent describes and claims access aggregation virtualization systems and methods for virtualizing an access aggregation device to provide logical access network configuration and operation.

53.    By virtualizing the access aggregation network, the inventions claimed in the '520 patent provide configurable network performance on logical access aggregation devices that link to and provide control of physical aggregation devices, which enable configured communication between network devices (e.g., wireless communication devices).

54.     By providing a configuration function, access aggregation virtualization according to the '520 patent provides the benefit of segregated control of network resources to selectively enhance a performance characteristic of a logical network.

55.     The inventions claimed in the '846, '359, and '520 patents enable a network operator to create and manage dynamically network slices, managed network services, and on-demand network capacity and performance.

### The '588 and '092 patents

56.     The '588 patent, naming Ken Kerpez as the sole inventor, is titled "Systems, Methods, and Apparatuses for Implementing Persistent Management Agent (PMA) Functions for the Control and Coordination of DPU and DSLAM Components," and claims priority to August 27, 2014.

57.     The '092 patent, titled "Systems, Methods, and Apparatuses for Implementing the Virtualization of Access Node Functions," names Ken Kerpez and John Cioffi as co-inventors and claims priority to August 27, 2014.

58.     The '588 patent is directed to a specific architecture for virtualizing particular functions in the access network. Claiming systems featuring a functions abstraction layer and a method for processing network element functions on a virtualized computing structure, the '588 patent enabled virtualization in the access network that had been hindered because many radio access network functions were compute-heavy, sensitive to latency, and required dedicated hardware. The claimed subject matter of the '588 patent enables departure from a radio access network (RAN) completely reliant upon dedicated hardware to meet low latency requirements.

59.     Dr. Cioffi and Dr. Kerpez realized that certain functions of the RAN lend themselves to virtualization while others (e.g., low level physical layer functions) typically do not and run most

effectively on dedicated hardware. For example, in 5G networks, the Radio Unit (RU), Distributed Unit (DU), and Central Unit (CU) each have different latency and computational requirements and constraints.

60.     The '092 and '588 patents describe and claim an architecture for managing a RAN that has been partially virtualized by applying software-defined networking principles and incorporating an abstraction layer that abstracts and manages underlying network functions.



61.     Network automation enabled by the functions abstraction layer described and claimed in the '588 patent is essential for effective management of modern networks like Verizon's 5G network due to highly complex and dynamic requirements of RAN components and required capabilities to deliver services like network slicing and closed-loop automation. Figure 5, below, depicts the architecture claimed in the '588 and '092 patents.



62.    In the methods claimed in the '588 patent, functions of broadband access network elements are processed on a virtualized computing structure. At least one function is provided in a virtualized implementation, which is updated in response to receiving operational data for broadband access from the broadband access network elements through a functions abstraction layer. Control parameters, at least partially based on the operation data, are generated to affect an operation of the broadband access network elements such as Quality of Service flow and the maximum and minimum percentages of physical resources to be allocated to a particular network slice. Control parameters are communicated to the broadband access network elements through the functions abstraction layer.

**The '305 and '059 patents**

63.    The '305 and '059 patents, titled "Systems and Methods for Chaining Control-Plane Virtual Functions for Ensuring End-to-End Quality of Service (QOS) of Internet Services," name Ken Kerpez as the inventor and claim priority to June 29, 2018.

64.    Dr. Kerpez created and claimed an architecture in which control-plane Virtual Network Functions (VNFs) communicate directly with each other, directly with an E2E (End-to-End) orchestrator, with each other through the E2E orchestrator, or through a shared database to effect a chaining that enables E2E Quality of Service (QoS) of Internet services.

65.    Dr. Kerpez recognized that ad-hoc methods of providing classes of service, with non-virtualized systems loosely communicating together or various systems performing functions in an uncoordinated manner were incapable of effectively providing end-to-end QoS. Using a single monolithic system was unwieldy, difficult to change or upgrade, and was not reusable, Dr. Kerpez observed.

66.    The subject matter claimed in the '059 and '305 patents provides improved control and management of network operations, particularly for real-time services, which is complex and challenging to implement and operate in a coordinated manner. For example, provision of network slices requires near-constant, real-time adjustment and tuning for optimal utilization and service level performance. Prior art service chaining solutions used sequentially connected network functions to create a Service Chain, which successively operates on user data in the data plane.

67.    QoS chaining invented by Dr. Kerpez, on the other hand, aggregates, analyzes, and operates on E2E QoS data and configurations in the control plane. Rather than create a Service Chain, the claimed subject matter of the '059 and '305 patents ensure the end-to-end QoS of a service or services.

68.     The '305 and '059 patents describe and claim systems and methods for QoS chaining that operates at a higher abstraction layer than network service chaining by operating on QoS data and configuration in a control plane. By virtualizing control-plane network functions, some of which may represent data-plane functions that collect diagnostic information, and enabling communication between and among VNFs, including communication of diagnostic information, QoS chaining abstracts control-plane functions of multiple data-plane elements and systems into an orchestrated set of VNFs. This enables high-level decisions about E2E service guarantees and specific decisions about how to achieve a desired service level.

69.     Dr. Kerpez described and claimed an E2E orchestrator to coordinate or chain the interchange of QoS data and configurations across multiple VNFs. This provides the important benefit of coordinating network functions and aggregating vast quantities of network data (e.g., network test, diagnostics, fault and performance data, and control and configure resource assignment) that was previously unmanageable at that level of abstraction to assure QoS performance and assign QoS levels end to end.

70.     Since Dr. Kerpez's inventions, standards bodies have adopted the subject matter claimed in the Epic Lane '059 and '305 patents (and others) and incorporated it into various technical specifications that guide broadband networking commercialization.

71.     For example, after the priority dates of the asserted claims, the 5G standards incorporated QoS chaining mechanisms to assure service level specifications for a particular network slice.



### 4.1.3     Procedures

#### 4.1.3.1     SLS Assurance Procedure

**Figure 4.1.3.1.1 SLS assurance procedure**

72.     The 5G standards now provide for service requirement support on the basis of a network slice utilizing performance indicators at the network slice subnet level derived from performance measurements collected at the NFs (Network Functions) that belong to the network slice subject and made available via a corresponding management service provider.

### 6.3.3     ServiceProfile <<dataType>>

#### 6.3.3.1     Definition

This data type represents the properties of the network slice related requirements that should be supported by a NetworkSlice instance in a 5G network. The network slice related requirements apply to a one-to-one relationship between a Network Slice Customer (NSC) and a Network Slice Provider (NSP). A network slice can be tailored based on the specific requirements adhered to an SLA agreed between NSC and NSP, see clause 2 of [50]. An NSP may add additional requirements not directly derived from SLA's, associated to the NSP internal [business] goals. The GST defined by GSMA (see [50]) and the service performance requirements defined in 3GPP TS 22.261 [28] and TS 22.104 [51] are all considered as input for the network slice related requirements.

73.    An exemplary embodiment of the inventions claimed in the '059 and '305 patents in a wireless 5G network is illustrated in Figure 8:



## VERIZON INFRINGES THE EPIC LANE PATENTS

74.    Verizon has adopted and deployed in its 5G wireless networks the inventions claimed in the Epic Lane Networks patents, leveraging network function virtualization and software-defined networking to deliver valuable communication services and products.

75.    Verizon implements a functions abstraction layer in its 5G networks and has adopted the management and orchestration architecture claimed in the Epic Lane patents.

76.    As part of its modernization efforts, Verizon has adopted Open RAN ("O-RAN") standards including O-RAN Service Management and Orchestration Framework and virtualized its Radio Access Network as claimed in the Epic Lane patents.

77.    Verizon implements E2E QoS chaining, the E2E orchestrator, and virtualization systems and methods claimed in the Epic Lane patents to deliver network slicing products and

services, including products sold under the "Verizon Frontline" brand, Verizon Managed Network Services, Verizon Private 5G Network Solutions, and Verizon Virtual Network Services.

78.     Leveraging technologies claimed in the Epic Lane patents has enabled Verizon to reduce capital expenditures while expanding its communication network capabilities and capacity, optimizing network resource utilization, and providing customized service offerings deployed across the United States.

79.     The network function virtualization and software-defined networking advances claimed in the Epic Lane Network patents are critical to Verizon's wireless network expansion and performance.

80.     Virtualizing access network functions according to the claimed subject matter of the Epic Lane Networks patents has enabled Verizon to achieve granular management of network resources, automated network monitoring, and improve overall performance and management of its 5G network.

81.     Verizon derives a substantial portion of its operating revenue from the development, design, distribution, and sale of virtualized and software-defined networking products and services.

82.     One of Verizon's services enabled by the Epic Lane patents is network slicing, which Verizon sells as a product and service to its customers. Verizon brands one of its network slicing products "Verizon Frontline."



83.    "Network slicing is a type of virtual networking technology in the same family of network function virtualization (NFV) and software-defined networking (SDN), which assist in evolving networks toward software-based automation." *See* Hilson, Gary, *"What Is 5G Network Slicing? | Do You Have the Team You Need?", Verizon Business, 2025* (last visited August 25, 2025). "Network slicing allows multiple logical networks to be created on top of a common shared physical network." *Id*.

84.    With its 5G network, Verizon can "dedicate portions of their network to meet [] customers' specific needs, scaling services up or down" including "enabling the Internet of Things (IoT) in a manufacturing environment or connecting and operating autonomous vehicles in a transport fleet, or separating AI-driven video analytics from point-of-sale information in a retail environment." For example, Verizon offers its "Frontline Network Slice" which "dedicate[s] part of [Verizon's] 5G Ultra Wideband network for public safety agencies" which "help[s] first responders coordinate operations using data-intensive apps and devices during incidents." *See Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/.

85.    Verizon recently conducted an IoT market survey of 500 companies to confirm that "IoT is a smart bet." *See Verizon Business IoT market survey: IoT a smart bet, AI a major accelerator*, Verizon, https://www.verizon.com/about/news/verizon-business-iot-market-survey (last visited November 4, 2025). The "soaring enthusiasm" for IoT is fueled by emerging technologies including "network slicing," which drives enterprise transformation. *Id*. Seventy-eight percent (78%) of survey respondents saw network slicing as "essential to customizing IoT performance, especially in Logistics & Supply Chain." *Id*. Remarkably, Verizon's survey found that 98% of the 500 enterprises surveyed expect that adoption of "network slicing . . . will only strengthen the strategic importance of IoT." *Id*.



IoT    Report    Infographic,    Verizon,    *available    for    download    at* https://www.verizon.com/about/sites/default/files/2025-10/iot_report_infographic_final_ogifg6981025_-_matthew_conte.pdf.

86.    In its own patent applications, filed years after the Epic Lane patents, Verizon describes the benefits of network slicing technology.

87.    In patent application no. 18/617,823, filed on March 27, 2024, Verizon told the United States Patent and Trademark Office:

> *"Network Slicing" is an innovation for implementation in Next Generation Mobile Networks, such as, for example, Fifth Generation New Radio (5G NR) Mobile Networks, and*

*represents a key benefit of Next Generation wireless network architectures.*

88.     In another patent application, Verizon told the Patent Office: "A technology available in new wireless networks, such as Fifth Generation New Radio networks (5G-NR), is network slicing. Using network slicing, a physical network may be sectioned (or 'sliced') into multiple, virtual, end-to-end networks. Each network slice may be dedicated for different types of services with different characteristics and requirements (e.g., latency, voice, jitter, bandwidth, pricing, etc.). U.S. Patent No. 11,330,646 (filed Nov. 6, 2020) at col. 1, lines 51-57.

89.     In another patent application, Verizon explained, "Network slicing is a form of virtual network architecture that enables multiple logical networks to be implemented on top of a common shared physical infrastructure using software defined networking (SDN) and/or network function virtualization (NFV). Each logical network, referred to as a "network slice," may encompass an end-to-end virtual network with dedicated storage and/or computation resources, may be configured to implement a different set of requirements and/or priorities, and/or may be associated with a particular Quality of Service (QoS) class, type of service, and/or particular enterprise customer associated with a set of UE devices. U.S. Patent No. 10,841,964 (filed Nov. 27, 2018) at 2:31-56.

90.     Verizon provides virtualization and network slicing products and services through a "a combination of direct, indirect and alternative distribution channels to market and distribute our products and services to Consumer and Business customers." *See Verizon 2024 Annual Report* at 6-7.

91.     Verizon utilizes a 5G virtualized radio access network (vRAN) kit that virtualizes the entire baseband, "along with a range of radio units." *See Monica Alleven, Verizon Expands*

*Nationwide 5G to 230M People* (Dec. 17, 2020), *https://www.fierce-network.com/operators/ verizon-expands-nationwide-5g-to-230m-people*.

92.    Verizon's manager of Global Corporate Communications and Public Relations, Karen Schulz, described how Verizon's vRAN first "decouples RAN hardware from software so they don't need to come from a single provider. Second, it moves the software to the cloud. That's how we optimize the value of virtualization."

> Karen Schulz, global network and technology communications at Verizon:
>
> "Virtualization means that we do not have to go and touch a particular cell site to make a software change," explains Schulz. "We can now do it through the cloud. And once virtualized, we can automate many of the functions to deploy changes even faster for customers."
>
> "The goal is to automate the network configuration changes so that we can scale resources dynamically," Schulz explains. This can allow for the right service level, whether a customer is employing massive-scale Internet of Things solutions in manufacturing, an AR/VR experience on the go or simply sending messages while on the move. Whatever the use case, the network can automatically scale the right resources for that use case and provide an exceptional experience. "This ultimately makes us more efficient in how we run our network, and ensures our customers have exactly what they need when they need it," Schulz says.

*Virtualization: What It Is and How It's Shaping Verizon's 5G Network*, Verizon (May 4, 2023), https://www.verizon.com/about/news/virtualization-positioning-our-5g-network-for-the-future.

93.    As a result, Verizon's 5G network has undergone a massive evolution to a cloud-based architecture, widespread virtualization, and aggressive adoption of Open RAN. Verizon leverages these technologies to automate network configurations and dynamically manage network demand and resources.

94.    Verizon's 5G vRAN utilizes a virtualized Central Unit (vCU) and a virtualized baseband or Distributed Unit (vDU) in the delivery of network broadband to its customers. *See, e.g.*, Bevin Fletcher, *Samsung Scores $6B Network Deal with Verizon*, Fierce Network (Sept. 8, 2020), https://www.fierce-network.com/financial/samsung-scores-6b-network-deal-verizon.

95.    Verizon's "vRAN architecture software elements can run on common-off-the-shelf (COTS) x86-based servers instead of dedicated hardware." *Id.* Verizon's "vRAN is an alternative to legacy radio access networks (RAN) in which radio network functions typically are tied to vendor-specific hardware." *Id.*

96.    Since 2020, Verizon has continued to develop and deploy its vRAN. Adam Koeppe, Verizon Senior Vice President of technology and planning stated in 2020 that, "Virtualizing the entire network from the core to the edge has been a massive, multi-year redesign effort of our network architecture that simplifies and modernizes our entire network." *See* Linda Hardesty*, Verizon Pats Self on Back for 5G Network Virtualization,* Fierce Network (Aug. 25, 2020), https://www.fierce-network.com/5g/verizon-pats-self-back-for-5g-network-virtualization.

97.    In 2022, Verizon announced that it had "deployed over 8,000 virtualized cell sites with a goal of deploying over 20,000 by the end of 2025." Verizon deploys more than 8,000 VRAN cell sites, rapidly marches towards goal of 20,000, VERIZON (September 12, 2022), https://web.archive.org/web/20250308090101/;    https://www.verizon.com/about/news/verizon-deploys-more-8000-vran-cell-sites.

98.    Network automation enabled by the functions abstraction layer is essential to managing and operating Verizon's 5G network due to highly complex and dynamic requirements of RAN components for delivery of services like network slicing and closed-loop automation.

99.    Verizon's deployment of these network capabilities and its need to improve quality and assure performance has driven a greater need for network automation, increasing the level of abstraction required to manage network resources.

100. The complexity and operational demands of Verizon's 5G network reached the "tipping point" where network automation is a necessity for Verizon to provide its portfolio of services and products.



Figure 1. The automation "tipping point" has made network automation a critical part of network operations management

101. Verizon has embraced virtualization and Open RAN technologies, deploying more than 130,000 O-RAN capable radios, including the Massive MIMO radios that are part of Verizon's 15,000 O-RAN compliant, virtualized cell sites in its commercial RAN.

102. O-RAN adopts the Management and orchestration architecture of 5G and adds to it the O-RAN Service Management and Orchestration Framework. Verizon's management and orchestration implementation uses telemetry data ingested by VNFs to optimize its 5G network.

103. Verizon's commitment to adopting and fostering O-RAN standards marked a pivotal shift toward a more open and interoperable network ecosystem and transitioning to O-RAN has provided Verizon many benefits including enhanced deployment flexibility, diversification of its supplier base, and, ultimately, improved service options for Verizon customers.

104.    "Verizon has been driving innovation in and adoption of O-RAN throughout the industry because we believe an open and standardized network drives more competition, more innovation, and increased supplier diversity," said Adam Koeppe, Senior Vice President of Network Technology, Strategy, and Planning at Verizon.

105.    Mr. Koeppe further explained, "Expanding on our industry-leading success with deploying O-RAN compliant radios and distributed units throughout our network, the introduction of the RAN Intelligent Controller will allow for greater flexibility and control over network operations."

106.    The RAN Intelligent Controller (RIC) is a software-based component within Verizon's Radio Access Network (RAN) that uses artificial intelligence and automation to optimize network performance by making decisions based on network conditions.

107.    Verizon's RIC is a key part of its O-RAN architecture implementation.

108.    Verizon's Mr. Koeppe has stated, "As the world moves toward a more interconnected future with 5G and beyond, the expectation for us is to deliver seamless, high-quality network experiences while managing the complexities of modern mobile networks."

109.    Speaking on behalf of Verizon, Mr. Koeppe further stated, "RAN Intelligent Control is emerging as a key enabler of efficient, adaptive, and scalable network operations and fits within our growing portfolio of automation and orchestration capabilities on the network."

110.    According to Mr. Koeppe, Verizon is "[e]xpanding on our industry-leading success with deploying O-RAN compliant radios and distributed units throughout our network, the introduction of the RAN Intelligent Controller will allow for greater flexibility and control over network operations."

111.    Verizon claims that its deployment of a cloud-native, container-based, virtualized architecture has led to increased flexibility, scalability and cost efficiency across its network.

112.    Verizon publicly has stated that its commitment to virtualization and orchestration was a precursor to its adoption of O-RAN.

113.    Verizon's 5G virtualization orchestration pairs ONAP for end-to-end service orchestration and closed-loop automation with a distributed, Kubernetes-based edge cloud (provided by Wind River Studio) that deploys and manages cloud-native network functions across the core and vRAN, enabling a fully virtualized 5G data session from core to edge.

114.    Verizon's orchestration architecture separates control and data planes, stitches virtualized functions to orchestration, and integrates analytics for automated, policy-driven operations as claimed in the Epic Lane patents.

115.    Having adopted the inventions claimed in the Epic Lane patents, Verizon creates service chains that allow Verizon Enterprise Solutions to build business implementations in the network.

116.    According to Shawn Hakl, Verizon Senior Vice President, Verizon "created something we call physical transport managers, which are a virtual representation of a physical circuit . . . [s]o now I've got the ability to service chain the network, along with virtual applications, along with a consolidated policy layer . . . [a]nd that's all organized around creating business outcomes and SLAs (service level agreements)." *See Verizon's Hakl on the importance of proactive management of network topology*, FIERCE NETWORK, [https://www.fierce-network.com/telecom/verizon-s-hakl-don-t-drown-network-complexities](https://www.fierce-network.com/telecom/verizon-s-hakl-don-t-drown-network-complexities) (last visited November 17, 2025)

117.    By practicing the Epic Lane patents and implementing QoS chaining, Verizon is able to provide a broad range of network services based upon the business outcome Verizon customers want, according to Mr. Hakl ("Do I want a business-to-business connection? Do I want business-to-consumer connection? Do I want Internet traffic delivered at a certain cost and performance ratio? Do I want a resilient tier access that incorporates MPLS plus wireless backup?").

118.    Mr. Hakl explained Verizon's offering: "When we put together a service chain, you could make policy for that whole service chain, including the network elements, based on what was available with the API set, which is essentially a virtual representation of the physical network connection . . . [w]e took the APIs that were available in our backend systems and basically moved them into a framework where we could integrate them with the orchestrator."

119.    Describing Verizon's adoption of technology embodied in the Epic Lane inventions, Mr. Hakl continued:

> *For example, a business-to-business customer may want its own internal network to connect with a partner, which could include a firewall on one end to make sure only the business partner has access to the network, a firewall over the top, encryption and a tunnel so nobody else sees the data.*
>
> *What that means from the control perspective is I've now got the ability to basically build those functions, put them in the network, pass them into our CMDB (configuration management database) completely linked, and then past our*

*service assurance engine so that you're monitoring the whole service.*

*[Verizon is] exposing the characteristics of that connection as a software representation of the physical connection . . . [s]o we build those service chains and then you can build your policy end-to-end.*

120.    Verizon recognized technical challenges including efficient resource allocation, particularly in the radio access network (RAN). These technical challenges are solved by implementation of the inventions claimed in the Epic Lane patents.

121.    In its application that led to the issuance of U.S. Patent No. 10,841,964, Verizon states: "However, while network slicing enables a provider of communication services to partition network resources into different network slices, the Radio Access Network (RAN), which includes the resources of the base stations that communicate with UE devices using wireless signals, is typically treated as a common resource in existing wireless access networks, such as Fourth Generation (4G) Long Term Evolution (LTE) wireless access networks. Thus, the RAN resources may not be efficiently allocated based on the requirements of various network slices and/or based on the requirements of various network services that may be used by a particular network slice or shared by multiple network slices."

122.    Verizon's implementation of a functions abstraction layer in its 5G network adheres to the technical standard set forth in 3GPP TS 28.533 ("Management and orchestration; Architecture framework").

**Verizon infringes the '359 patent.**

123.    Verizon infringes many claims of the '359 patent including at least claims 1, 3-7, 9,10, and 12-17 by offering Verizon's 5G vRAN kit that includes a plurality of gNodeB's (gNBs) that provide broadband services to remote UEs through the NR-Uu radio interfaces by utilizing network slicing functions, as shown in the NG-RAN architecture shown below.



The NG-RAN architecture is illustrated in Figure 4.1-1 below.

Figure 4.1-1: Overall Architecture

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/17.00.00_60/ts_138300v170000p.pdf

An NG-RAN node is either:

- a gNB, providing NR user plane and control plane protocol terminations towards the UE; or

**gNB**: node providing NR user plane and control plane protocol terminations towards the UE, and connected via the NG interface to the 5GC.

Figure 1: overview of the 5GS

The main entity of the NG-RAN is the gNB, where "g" stands for "5G" and "NB" for "Node B", which is the name inherited from 3G onwards to refer to the radio transmitter. The radio interface is named "NR-Uu" for similar reasons, although with divergences:

https://www.3gpp.org/technologies/5g-system-overview

124.    Verizon's 3GPP management system (i.e., *the management entity coupled to the plurality of physical access aggregation interfaces*) creates a plurality of NetworkSliceSubnets (i.e., *virtual access aggregation devices*) related to the gNBs (i.e., *the physical access aggregation devices*) in the network.

125.    Verizon's management system "performs the LCM operations required according to the request (activate, modify, de-activate, or terminate) on one or more NetworkSliceSubnet instance(s) constituents" (i.e., *performs functions that support associated logical aggregation networks with network characteristics defined by service definition rules*). *See* https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf.

## 4.2    Functional Split

The **gNB** and ng-eNB host the following functions:

- Functions for Radio Resource Management: Radio Bearer Control, Radio Admission Control, Connection Mobility Control, Dynamic allocation of resources to UEs in both uplink and downlink (scheduling);

- IP and Ethernet header compression, uplink data decompression, encryption and integrity protection of data;

- Selection of an AMF at UE attachment when no routing to an AMF can be determined from the information provided by the UE;

- Routing of User Plane data towards UPF(s);

- Routing of Control Plane information towards AMF;

- Connection setup and release;

- Scheduling and transmission of paging messages;

- Scheduling and transmission of system broadcast information (originated from the AMF or OAM);

- Measurement and measurement reporting configuration for mobility and scheduling;

- Transport level packet marking in the uplink;

- Session Management;

- Support of Network Slicing;

- QoS Flow management and mapping to data radio bearers;

- Support of UEs in RRC_INACTIVE state;

- Distribution function for NAS messages;

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/17.00.00_60/ts_138300v170000p.pdf

### 5.4.3     Provisioning of a NetworkSliceSubnet instance

| Use case stage | Evolution/Specification | <<Uses>> Related use |
|---|---|---|
| Goal | To perform operations of the provisioning of a NetworkSliceSubnet instance. | |
| Actors and Roles | A Network Operator (NOP) plays the role of a Network Slice Provider (NSP) responsible for the network slice subnet. | |
| Telecom resources | 3GPP management system | |
| Assumptions | None | |
| Pre-conditions | Preparation for the NetworkSliceSubnet instance is completed. For the creation use case an NetworkSliceSubnet instance does not exist. For activation, modification, de-activation or termination use cases, the NetworkSliceSubnet instance exists. | |
| Begins when | The 3GPP management system has received a request from the Network Operator. | |
| Step 1 (M) | The 3GPP management system assesses the feasibility of executing the request, e.g., checks the inventory and the required NetworkSliceSubnet instance constituents, and reserves available resources. | |
| Step 2 (M) | The 3GPP management system performs the LCM operations required according to the request (activate, modify, de-activate, or terminate) on one or more NetworkSliceSubnet instance(s) constituents. In case the required LCM operation is create a new NetworkSliceSubnet instance constituent is created. | |
| Step 3 (M) | The 3GPP management system replies to the Network Operator that the requested operation is completed. | |
| Ends when | All the mandatory steps have passed. | |
| Exceptions | In case the feasibility check fail, the use case fails and the 3GPP management system rejects the request with the reason included in the reply. In case any of the LCM operations fail, the use case fails and the 3GPP management system replies to the Network Operator that the requested operation has failed with the reason included in the reply. | |
| Post-conditions | A NetworkSliceSubnet instance has been provisioned. | |
| Traceability | REQ-3GPPMS-CON-06, REQ-3GPPMS-19, REQ-3GPPMS-CON-20, REQ-3GPPMS-CON-21, REQ-3GPPMS-CON-22 | |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

126.     The NetworkSliceSubnet instances utilized by Verizon in the access network support logical aggregation networks that form a component of a network slice. As indicated below, "[t]he network slice subnet represents a group of network functions (including their corresponding resources) that form part or complete constituents of a network slice."



https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

127.    Each instance of a NetworkSliceSubnet in a Verizon access network is created with network characteristics defined by service definition rules to support the needs of the network slices of which it is a part. For example, as explained below, "[n]etwork slicing allows the operator to provide customized networks," including introducing "different requirements on functionality (e.g., priority, charging, policy control, security, and mobility), differences in performance requirements (e.g., latency, mobility, availability, reliability and data rates), or they can serve only specific users (e.g., MPS users, Public Safety users, corporate customers, roamers, or hosting an MVNO)."

# 6     Basic capabilities

## 6.1     Network slicing

### 6.1.1     Description

Network slicing allows the operator to provide customised networks. For example, there can be different requirements on functionality (e.g. priority, charging, policy control, security, and mobility), differences in performance requirements (e.g. latency, mobility, availability, reliability and data rates), or they can serve only specific users (e.g. MPS users, Public Safety users, corporate customers, roamers, or hosting an MVNO).

A network slice can provide the functionality of a complete network, including radio access network functions, core network functions (e.g. potentially from different vendors) and IMS functions. One network can support one or several network slices.

https://www.etsi.org/deliver/etsi_ts/122200_122299/122261/16.15.00_60/ts_122261v161500p.pdf

**Verizon infringes the '520 patent.**

128.    Verizon infringes many claims of the '520 patent including at least claims 17 and 20 by offering and using its virtualized radio access network (Verizon's 5G vRAN) that include access aggregation devices comprising one or more physical ports or equivalent, namely base stations or gNodeB's (gNBs) that are responsible for managing access to the radio interface, connecting a network device such as a user's mobile phone (user equipment or 'UE') to the 5G core network.



https://www.etsi.org/deliver/etsi_ts/138400_138499/138401/16.05.00_60/ts_138401v160500p.pdf

129.    Verizon's management system represents the physical resources in the access network as a plurality of Network Slice Subnet instances, each of which forms a component of one or more network slices. UEs connect to network slices through the logical ports of respective network slice subnets in the access network. As shown below, the Verizon 3GPP management system comprises management functions that establish control interfaces to exchange management services (MnSs) with the entities for which they are responsible.



Figure A.8.1: An example of deployment scenario for management of a mobile network including network slicing

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf



https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

130. The management system oversees and coordinates the Verizon 5G network, including both the physical and virtual elements. This includes managing Network Slice Subnets and gNBs (access aggregation devices).

131. Verizon's management system provisions a RAN Network Slice Subnet by establishing links to the relevant RAN network functions to configure the physical resources that the gNBs will associate with each logical network slice. Once a UE establishes a connection, it can communicate, through the 5G network, with a second network device.



Figure A.4.1 The deployment scenario for network slice subnet management with interface to NFV-MANO

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

132. The physical RAN resources allocated to a NetworkSliceSubnet instance are expressed as RRM policies governing the gNBs that support a given NSSAI.

| sNSSAIList | It represents the list of S-NSSAI the managed object is supporting, NSSAI is a set of supported S-NSSAI(s), an S-NSSAI is comprised of a SST (Slice/Service type) and an optional SD (Slice Differentiator) field, (See 3GPP TS 23.003 [13]).<br><br>allowedValues: See 3GPP TS 23.003 [13] | type: <<S-NSSAI>><br>multiplicity: *<br>isOrdered: N/A<br>isUnique: N/A<br>defaultValue: None<br>allowedValues: N/A<br>isNullable: False |
|---|---|---|
| rRMPolicyType | Type of the RRM policy.<br>The value 0 denotes use of the rRMPolicy.<br>The value 1 denotes use of the rRMPolicyNSSId, rRMPolicyRatio<br>The value 2 denotes use of the rRMPolicyRatio2.<br><br>allowedValues: 0 : 65535. | type: Integer<br>multiplicity: 1<br>isOrdered: N/A<br>isUnique: N/A<br>defaultValue: None<br>isNullable: False |
| rRMPolicyNSSIId | The list of S-NSSAIs  for which a rRMPolicyRatio value is specified<br><br>allowedValues: Not applicable. | type: DN<br>multiplicity: 1..*<br>isOrdered: N/A<br>isUnique: N/A<br>defaultValue: None<br>allowedValues: N/A<br>isNullable: False |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128541/15.02.00_60/ts_128541v150200p.pdf.

133.    Verizon's management system associates the logical network slices with the physical resources that a gNB can allocate to links with UEs, depending the network slices to which they are connected. The link between a particular UE and a gNB is identified by a C-RNTI.

> In the downlink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible assignments when its downlink reception is enabled (activity governed by DRX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

> In the uplink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible grants for uplink transmission when its downlink reception is enabled (activity governed by DRX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/15.16.00_60/ts_138300v151600p.pdf

**Verizon infringes the '846 patent.**

134.    Verizon infringes many claims of the '846 patent including at least claims 1, 2, 3, 4, 6, 8, 13, and 19 of the '846 patent by using and providing access to the Verizon 5G access network architecture, which includes gNBs that are responsible for managing access to the radio interface, connecting user equipment (UE) to the 5G core network.

135.    In the Verizon network, the 3GPP management system creates and maintains
NetworkSliceSubnet instances (i.e., *one or more virtual access aggregation devices*) in the access
network to form part of network slices. These NetworkSliceSubnets provide virtual access
aggregation devices that represent functions of gNBs in the network.

## 4.5    Network slice subnet concepts

The network slice subnet represents a group of network functions (including their corresponding resources) that form part or complete constituents of a network slice. The grouping of the network functions allows the management of each group of network functions to be conducted independently of the network slice.

The network slice subnet concepts include the following aspects:

- A network slice subnet constituent may include network function(s) and other constituent network slice subnet(s).

- A network slice subnet may be shared by two or more network slices, this is called a shared constituent of network slice. This sharing may be direct or indirect. The direct sharing implies that the network slice subnet is offered as network slice multiple times. The indirect sharing implies that the network slice subnet is either a constituent of a network slice subnet shared by two or more network slices, or is shared by two or more network slice subnet(s) which are in turn offered as different network slices.

***ETSI***

| 3GPP TS 28.530 version 17.2.0 Release 17 | 16 | ETSI TS 128 530 V17.2.0 (2022-05) |
|---|---|---|

- A network slice subnet may be shared by two or more network slice subnet(s), this is also called a shared constituent of network slice subnet. The sharing may be direct or indirect. The direct sharing implies that network slice subnet is a constituent of two or more network slice subnets. The indirect sharing implies that network slice subnet is a constituent of a shared network slice subnet.

- A network slice subnet that is dedicated to one network slice and is not shared as a constituent by two or more network slice subnet(s) is called a non-shared network slice subnet.

- A network slice subnet may contain instances of CN network functions only, or instances of AN network functions only, or any combination thereof.

- A network slice subnet may additionally have information representing a set of links with capacities to provide connection between network functions. This information is also known as TN requirements of the network slice subnet.

- The resources used, and whose management aspects are represented by a network slice subnet comprise physical and logical resources. In case of virtualization, virtualized resources may be used.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

136.    The centralized 3GPP management system includes cross domain management services that coordinate network functions to create network slices that provide end-to-end service guarantees. gNBs communicate upstream (i.e., are *communicatively interfaced*) through the NG interface to the centralized 3GPP management system.



**Figure 6.1-1: Overall architecture**

## 4.8 Management capability support in multiple tenant environment

In 3GPP management sytem, tenant represents a group of MnS consumers associated with the management capabilities they are allowed to access and consume. The 3GPP management system provides multi-tenancy support, by associating different tenants with different sets of management capabilities. Every tenant may be authorized to access and consume those MnSs that the operator makes available to this tenant based on SLA.

https://www.etsi.org/deliver/etsi_ts/138400_138499/138401/16.05.00_60/ts_138401v160500p.pdf



https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/17.03.00_60/ts_128533v170300p.pdf

137.    Verizon's 3GPP management system oversees and coordinates the 5G network, including both the physical and virtual elements. This includes managing NetworkSliceSubnets (i.e., *virtual access aggregation devices*) and gNBs (i.e., physical *access aggregation devices*) that provide broadband service to UEs (i.e., *remote broadband terminals*) via radio links, defined by the physical resources of which they are comprised. The link between a particular UE and gNB is identified by a C-RNTI.

In the downlink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible assignments when its downlink reception is enabled (activity governed by DRX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

In the uplink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible grants for uplink transmission when its downlink reception is enabled (activity governed by DRX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/15.16.00_60/ts_138300v151600p.pdf

138.    In Verizon's 5G networks, the physical RAN resources (i.e., *the plurality of physical ports*) allocated to a NetworkSliceSubnet instance are expressed as RRM policies associated with gNBs (the CU, or central unit, is a component of the gNB).

### 4.3.4    `NRCellCU`

#### 4.3.4.1    Definition

This IOC represents the information required by CU that is responsible for the management of inter-cell mobility and neighbour relations via ANR.

#### 4.3.4.2    Attributes

| Attribute name | Support Qualifier | isReadable | isWritable | isInvariant | isNotifyable |
|---|---|---|---|---|---|
| cellLocalId | M | T | T | F | T |
| sNSSAIList | CM | T | T | F | T |
| rRMPolicyType | CM | T | T | F | T |
| rRMPolicyNSSIId | CM | T | T | F | T |
| rRMPolicyRatio | CM | T | T | F | T |
| rRMPolicyRatio2 | CM | T | T | F | T |
| rRMPolicy | CM | T | T | F | T |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128541/15.02.00_60/ts_128541v150200p.pdf

### 5.1.2    Network slice subnet instance creation

| Use case stage | Evolution/Specification | <<Uses>> Related use |
|---|---|---|
| Goal | Create a new network slice subnet instance or use an existing network slice subnet instance to satisfy the network slice subnet related requirements; provide the provisioning service consumer with identity of the NFVO which the consumer can use for further access to the information of the involved VNFs, PNFs and NSs. | |
| Actors and Roles | NSMF, who acts as an example of network slice subnet management service consumer. | |
| Telecom resources | Network Slice Subnet instance<br>Network Service instance<br>NSSMF, who acts as an example of network slice subnet management service provider.<br>The operator deployed NFVO to manage the lifecycle of VNFs and interconnection between the VNFs and PNFs in terms of the NS instances. | |
| Step 7 (M) | NSSMF is using the NF provisioning service to configure the NSSI constituents. In case of RAN NSSI, the configuration contains RRM policy information for individual Radio cells. In the cells shared by multiple NSSIs such policy includes guidance for split of Radio resources between the NSSIs. | NF provisioning service |

**REQ-PRO_NSSI-FUN-6**   The network slice subnet provisioning service provider shall have the capability allowing its authorized consumer to request the configuration of the RAN NSSI constituents with the RRM policy information for simultaneous support of multiple NSIs.

**REQ-PRO_NSSI-FUN-7**   The network slice subnet provisioning service provider shall have the capability allowing its authorized consumer to obtain network slice subnet instance information.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

139.    The 3GPP management system in Verizon's 5G networks receives requests from authorized NSS management services (i.e., the *control interface*) to manage the logical ports represented by the resources allocated to a network slice subnet (i.e., *a first virtual access aggregation device*).

## 5.1.16    Network slice subnet instance management capability exposure

| Use case stage | Evolution/Specification | <<Uses>> Related use |
|---|---|---|
| Goal | Enable authorized NSS management service consumer to obtain network slice subnet management capability (e.g. obtaining measurement, updating resource allocations). | |
| Actors and Roles | NSS management service consumer (e.g., the operator or NSMF or NSSMF) | |
| Telecom resources | NSS management service provider (e.g., NSSMF) Network slice subnet instance NF(s) | |
| Assumptions | NSS management service consumer is authorized to obtain the allowed management capability from NSS management service provider. | |
| Pre-conditions | NSSI is created. | |
| Begins when | NSS management service consumer wants to obtain the network slice subnet management capability. | |
| Step 1 (M) | NSS management service consumer sends a request to NSS management service provider to obtain the network slice subnet instance management capability. The information indicating which specific management capability need to be obtained may be included in the request. | |
| Step 2 (M) | NSS management service provider processes this request. | |
| Step 3 (M) | NSS management service provider provides the required exposure interfaces to NSS management service consumer. | |
| Ends when | All the steps identified above are successfully completed. | |
| Exceptions | One of the steps identified above fails. | |
| Post-conditions | NSS management service consumer obtained the allowed network slice subnet instance management capability. | |
| Traceability | REQ-PRO_NSSI-FUN-15 | |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/15.03.00_60/ts_128531v150300p.pdf

140.    These received requests included requests to consume performance and diagnostic information and modify or optimize a network slice subnet in the access network.

**REQ-3GPPMS-CON-12** The 3GPP management system shall be able to report performance measurement data of a NetworkSliceSubnet instance to the NOP.

**REQ-3GPPMS-CON-19** The 3GPP management system shall be able to activate a NetworkSliceSubnet instance.

**REQ-3GPPMS-CON-20** The 3GPP management system shall be able to modify a NetworkSliceSubnet instance.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

141. Performance information for a Verizon network slice subnet instance (NSSAI) includes, for example, average downlink/uplink UE throughput and average delay.

---

**5.1.1.3.1    Average DL UE throughput in gNB**

a) This measurement provides the average UE throughput in downlink. This measurement is intended for data bursts that are large enough to require transmissions to be split across multiple slots. The UE data volume refers to the total volume scheduled for each UE regardless if using only primary- or also supplemental aggregated carriers. The measurement is optionally split into subcounters per QoS level (mapped 5QI or QCI in NR option 3) and subcounters per supported S-NSSAI, and subcounters per PLMN ID.

---

# A.9    Monitoring of UE Throughput in NG-RAN

Keeping track of UL and DL UE throughput in the NG-RAN is essential, to ensure end user satisfaction and well-functioning and well configured cells and scheduling features.

The restricted UE throughput per mapped 5QI will show the scheduling efficiency and QoS priority handling in the gNB and the ratio between unrestricted and restricted volume will show the gNB ability to handle small data transfers efficiently.

To be able to monitor the spread of throughput within the cell, and estimate the ratio of satisfied users, the throughput distribution measurement can be used.

When network slicing is supported by the NG-RAN, multiple s S-NSSAIs may be supported. The UL and DL UE throughput for each S-NSSAI is then of importance to the operator to pinpoint a specific performance problem.

---

**5.1.1.1.1    Average delay DL air-interface**

a) This measurement provides the average (arithmetic mean) time it takes for packet transmission over the air-interface in the downlink direction. The measurement is calculated per PLMN ID and per QoS level (mapped 5QI or QCI in NR option 3) and per supported S-NSSAI.

b) DER (n=1)

c) This measurement is obtained as: sum of (point in time when the last part of an RLC SDU packet was sent to the UE which was consequently confirmed by reception of HARQ ACK from UE for UM mode or point in time when the last part of an RLC SDU packet was sent to the UE which was consequently confirmed by reception of RLC ACK for AM mode, minus time when corresponding RLC SDU part arriving at MAC layer) divided by total number of RLC SDUs transmitted to UE successfully. The measurement is performed per PLMN ID and per QoS level (mapped 5QI or QCI in NR option 3) and per supported S-NSSAI.

---

https://www.etsi.org/deliver/etsi_ts/128500_128599/128552/17.07.01_60/ts_128552v170701p.pdf

142. Verizon's 3GPP management service sends a notification indicating whether, for example, a provisioning management selection complies with operational constraints and is completed.

## 5.4.3    Provisioning of a NetworkSliceSubnet instance

| Use case stage | Evolution/Specification | <<Uses>> Related use |
|---|---|---|
| Goal | To perform operations of the provisioning of a NetworkSliceSubnet instance. | |
| Actors and Roles | A Network Operator (NOP) plays the role of a Network Slice Provider (NSP) responsible for the network slice subnet. | |
| Telecom resources | 3GPP management system | |
| Assumptions | None | |
| Pre-conditions | Preparation for the NetworkSliceSubnet instance is completed. For the creation use case an NetworkSliceSubnet instance does not exist. For activation, modification, de-activation or termination use cases, the NetworkSliceSubnet instance exists. | |
| Begins when | The 3GPP management system has received a request from the Network Operator. | |
| Step 1 (M) | The 3GPP management system assesses the feasibility of executing the request, e.g., checks the inventory and the required NetworkSliceSubnet instance constituents, and reserves available resources. | |
| Step 2 (M) | The 3GPP management system performs the LCM operations required according to the request (activate, modify, de-activate, or terminate) on one or more NetworkSliceSubnet instance(s) constituents. In case the required LCM operation is create a new NetworkSliceSubnet instance constituent is created. | |
| Step 3 (M) | The 3GPP management system replies to the Network Operator that the requested operation is completed. | |
| Ends when | All the mandatory steps have passed. | |
| Exceptions | In case the feasibility check fail, the use case fails and the 3GPP management system rejects the request with the reason included in the reply. In case any of the LCM operations fail, the use case fails and the 3GPP management system replies to the Network Operator that the requested operation has failed with the reason included in the reply. | |
| Post-conditions | A NetworkSliceSubnet instance has been provisioned. | |
| Traceability | REQ-3GPPMS-CON-06, REQ-3GPPMS-19, REQ-3GPPMS-CON-20, REQ-3GPPMS-CON-21, REQ-3GPPMS-CON-22 | |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

**Verizon infringes the '588 patent.**

143.    Verizon infringes many claims of the '588 patent including at least claims 1, 4, 10, 17, 18, and 19 by using and providing access to the Verizon's 5G network.

144.    Verizon has undertaken a massive evolution to a cloud-based architecture, widespread virtualization, and aggressive adoption of Open RAN. Verizon leverages these technologies to automate network management, monitoring, and configure, manage, and optimize resources dynamically.

145.    Verizon describes its move to virtualization as building "more flexibility into the network, which is a necessity, as 5G allows for more uses, such as advanced Internet of Things (IoT) technologies."



In September 2022, Verizon announced that it had deployed 8,000 virtualized radio access network (vRAN) sites across the U.S., with a goal of deploying more than 20,000 by the end of 2025. (The number of deployed sites is now over 10,000, so we're well on our way.) It was a huge milestone that sets Verizon's network apart and shows its commitment to advanced technologies in its network. But what exactly is a vRAN? What's the purpose of all these sites, and how will virtualization benefit consumers and businesses? Let's take a look.

https://www.verizon.com/about/news/virtualization-positioning-our-5g-network-for-the-future.

"The massive evolution of our network over the past few years including our move to a cloud-based architecture, widespread virtualization and our aggressive adoption of O-RAN standards and capabilities has enabled us to show O-RAN interoperability success in a commercial environment," said Adam Koeppe, Senior Vice President of Technology Planning at Verizon.

O-RAN offers the promise of a wide range of benefits that should introduce new competition and innovation into the RAN ecosystem with the establishment of open and interoperable interfaces between different hardware and software components. The transition to Open RAN has the potential to bring many benefits in terms of deployment flexibility, faster innovation in an open environment, and greater service options by increasing the opportunity for new entrants to provide competitive and advanced solutions. More competition, more innovation, and increased supplier diversity will all be net benefits to operators and customers.

https://www.verizon.com/about/news/verizon-deploys-first-interoperable-multi-vendor-o-ran-das-system.

146.    Verizon describes itself as a global leader in driving virtualized and Open Radio Access Network (O-RAN) technologies.

147.     In 2024, Verizon announced that it had deployed O-RAN based Distributed Antenna Systems (DAS) at two locations in Texas.

148.     YANG is the language used by Verizon to standardize the data models organized in the abstractions layer.

149.     Verizon's O-RAN implementation organizes control loops into three categories depending upon the responsible network function and sensitivity to latency.



**Figure 9.1.5-1: Modify Parameters**

150.     In Verizon's O-Ran implementation, many of the functions of the eNodeB are virtualized save the radio unit (RU).



**Figure 6.1-2: Logical Architecture of O-RAN**

151.     Verizon's 5G systems support network slicing, including by leveraging virtual network functions (VNFs) and closed control loop management to manage service guarantees associated with Network Slice Instances (NSIs).

### 4.4.1    General

From a management point of view a network slice is complete in the sense that it includes all the network function instances, with their supporting resources, to provide service for certain business purpose (e.g. to support a certain set of communication services, provide PNI-NPNs, etc. in NSaaS model) or operational efficiencies purpose (e.g. to optimize operator internal O&M procedures in network slice as NOP internals model). In other words, the network slice is complete because it completely satisfies the associated SLS.

The following concepts are related to network slicing management:

  a.  Services which are supported by network slices (services whose service level requirements are satisfied by the SLS associated with the network slices).

  b.  Network slice subnet instances and networks composed of PNF, VNF or both and offered as network slices.

  c.  Network function (PNFs, VNFs) grouped into network slice subnets.

  d.  Resources which support the network (e.g. virtualized resource, non-virtualized resource)

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

The management system is collecting the service experience information and monitoring the KPIs, related to the targeted services. Analytics hosted by the MDAF may be utilized for processing of the network data to derive and analyse the KPIs. If the service quality assurance and optimization function detects performance degradation the 3GPP management system may continuously modify the configuration parameters in the corresponding NG-RAN and 5GC nodes and NSI(s)/NSSI(s), to satisfy the SLA requirement. In case that changes of communication service SLS are needed, those changes may result as input to the 3GPP management system.



**Figure 4.3.1: Overview of closed control loop information flows**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128535/17.08.00_60/ts_128535v170800p.pdf

152.    The gNBs of Verizon's vRANs provide a connection point for UEs into the network. The functionality of gNBs is logically divided into a Central Unit (gNB-CU) and one or more Distributed Units (gNB-DU). This functional split allows gNB network functions to be virtualized.

**gNB**: node providing NR user plane and control plane protocol terminations towards the UE, and connected via the NG interface to the 5GC.



The NG-RAN architecture is illustrated in Figure 4.1-1 below.

**Figure 4.1-1: Overall Architecture**

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/17.00.00_60/ts_138300v170000p.pdf

## 4.1    NR and NG-RAN deployment scenarios

According to NG-RAN architecture defined in 3GPP TS 38.300 [3], An NG-RAN node is either a gNB or an ng-eNB connected to 5GC.

A gNB may consist of a gNB-CU and one or more gNB-DU(s), and a gNB-CU may consist of a gNB-CU-CP and one or more gNB-CU-UP. From functional split point of view, there have following gNB deployment scenarios which are specified in 3GPP TS 38.401 [4]:

1) gNB which does not consist split function.

2) gNB which consists of gNB-CU and gNB-DU(s).

3) gNB which consists of gNB-CU-CP, gNB-CU-UP(s) and gNB-DU(s).

Abovementioned deployment scenarios apply to en-gNB also.

Part of gNB (e.g. gNB-CU) can be deployed as virtualized network function.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128540/17.02.00_60/ts_128540v170200p.pdf

153.    The 3GPP management system works in conjunction with NFV MANO (network function virtualization management and orchestration) to create and configure virtualized gNB functions.



Figure 5.13.1-2: High-level view of the vRAN service across WAN

https://www.etsi.org/deliver/etsi_gr/NFV-IFA/001_099/022/03.01.01_60/gr_nfv-ifa022v030101p.pdf

154.    The 3GPP management system of Verizon's 5G networks consists of Management Functions (MnF), which produce or consume management services (MnS). This abstraction layer allows MnFs to analyze operational data related to performance of gNBs in the RAN and update (i.e., *in response to receiving operational data*) the attributes of, e.g., the NRCellCU IOC, to ensure that service parameters are met.

## 4.5     Management Function (MnF) concept

A Management Function (MnF) is a logical entity playing the roles of MnS consumer and/or MnS producer.

A Management Service produced by MnF may have multiple consumers. The MnF may consume multiple Management Services from one or multiple Management Service producers. An example of a MnF playing both roles (Management Service producer and consumer) illustrated in the figure 4.5.1 below.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

**Information Object Class (IOC):** An IOC represents the management aspect of a network resource. It describes the information that can be passed/used in management interfaces. Their representations are technology agnostic software objects. IOC has attributes that represents the various properties of the class of objects. See the term "attribute" defined in [10]. Furthermore, IOC can support operations providing network management services invocable on demand for that class of objects. An IOC may support notifications that report event occurrences relevant for that class of objects. It is modelled using the stereotype "Class" in the UML meta-model. See TS 32.156 [10] for additional information on IOC.

https://www.etsi.org/deliver/etsi_ts/128600_128699/128622/16.07.00_60/ts_128622v160700p.pdf

| Performance measurements | Description |
|---|---|
| Mean DL PRB used for data traffic | Provides the mean number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.5 in TS 28.552 [5]). |
| Peak DL PRB used for data traffic | Provides the peak number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.9 in TS 28.552 [5]) |
| Mean UL PRB used for data traffic | Provides the mean number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.7 in TS 28.552 [5]). |
| Peak UL PRB used for data traffic | Provides the peak number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.10 in TS 28.552 [5]).. |
| Average DL UE throughput in gNB | Provides the average UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.1 in TS 28.552 [5]). |
| Distribution of DL UE throughput in gNB | Provides the distribution of the UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.2 in TS 28.552 [5]). |
| Average UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.3 in TS 28.552 [5]). |
| Distribution of UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.4 in TS 28.552 [5]). |
| Mean number of Active UEs in the DL per cell | Provides the mean number of active UEs in downlink in an NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.23.1 in TS 28.552 [5]). |

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

**REQ-NGRAN_NRM-CON-003:** The NRM definitions shall support management of virtualized network functions that are part of gNB, e.g. virtualized gNB-CU.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128540/17.02.00_60/ts_128540v170200p.pdf

155.    In another Verizon embodiment, the '588 enables network slicing.

156.    The Network Slice Subnet Management Function (NSSMF) interacts with the Network Function Management Function (NFMF) and the NFV-MANO to update the RRM policies of the virtualized implementation, e.g., gNB-CU.

NFMF (Network Function Management Function) provides the management services for managing one or more NF(s) and may consume some management services produced by other functional blocks.

The NF provides some management services, for example the NF performance management services, NF configuration management services and NF fault supervision services.

NSSMF provides the management services for one or more NSSI and may consume some management services produced by other functional blocks.

NSMF provides the management services for one or more NSI and may consume some management services produced by other functional blocks.

## 5.2    Management interactions with NFV MANO

3GPP management system shall be capable to consume  NFV MANO interface (e.g. Os-Ma-nfvo, Ve-Vnfm-em and Ve-Vnfm-vnf reference points).



**Figure A.4.1 The deployment scenario for network slice subnet management with interface to NFV-MANO**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

157.    Based on analysis of the performance measurement data (i.e., the *operation data*), the 3GPP management system generates control parameters to update RRM policies, including the maximum and minimum percentages of physical resources the gNB-CU should allocate to a particular network slice.

### 7.2.2    RRM resources optimization for network slice instance(s)

**Table 7.2.x.2.1-1: RRM related parameters**

| Control parameters | Definition | Legal Values |
|---|---|---|
| Maximum RRM policy ratio | This parameter specifies the maximum percentage of RRM resources used by the network slice instance(s). See attribute `rRMPolicyMaxRatio` in TS 28.541 [13]. | 0..100 |
| Minimum RRM policy ratio | This parameter specifies the minimum percentage of RRM resources used by the network slice instance(s). See attribute `rRMPolicyMinRatio` in TS 28.541 [13]. | 0..100 |
| Dedicated RRM policy ratio | This parameter specifies the maximum percentage of RRM resources that are dedicated to the network slice instance(s). See attribute `rRMPolicyDedicatedRatio` in TS 28.541 [13]. | 0..100 |

### 6.4.2.3    RRM resources optimization for network slice instance(s)

| Use case stage | Evolution/Specification | <<Uses>> Related use |
|---|---|---|
| Goal | To enable the optimization of the RRM resources allocated among network slice instance(s) to ensure the RRM resources are efficiently used, while providing quality end-user experience and performance. | |
| Actors and Roles | C-SON function to support RRM resource optimization for network slice instance(s). | |
| Telecom resources | - gNB;<br>- The producer of provisioning MnS | |
| Assumptions | N/A | |
| Pre-conditions | - 5G NR cells are in operation.<br>- An AI/ML model has been created based on the RRM related performance measurements received previously. | |
| Begins when | The C-SON function has been enabled. | |
| Step 1 (M) | The C-SON function collects RRM related measurements on a per network slice instance basis (e.g. mean DL/UL PRB used for data traffic, mean number of DRBs successfully setup, and mean number of PDU Sessions successfully setup, ... etc.), by consuming the MnS of performance assurance. | |
| Step 2 (M) | The C-SON function analyzes the measurements to train the AI/ML model and determines the actions to optimize the RRM resources for network slice instance(s) that include consuming the MnS of provisioning to update the appropriate RRM policies. | |
| Ends when | All the steps identified above are successfully completed. | |
| Exceptions | One of the steps identified above fails. | |
| Post-conditions | The RRM resources for network slice instance(s) have been optimized. | |
| Traceability | **REQ-RRM-FUN-1, REQ-RRM-FUN-2** | |

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

158.    Verizon's 3GPP management system, through the relevant management functions (i.e., the *functions abstraction layer*), communicates a modifyMOIAttributes request message to a gNB (i.e., *at least one of the broadband access network elements*), where the request message includes control parameters to be updated.



**Figure 7.11-1: Network Function Instance Modify procedure**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/18.05.00_60/ts_128531v180500p.pdf

### 8.3.3    RRM resources optimization for network slice instance(s)

Figure 8.3.3-1 depicts an example of network slice instances that are created to support various services, such as URLLC, eMBB, or mMTC with different RRM resources requirements, where network slice instances sNSSAI #2-1 and sNSSAI #2-2 support a kind of RRM requirements, while network slice instances sNSSAI #1 supports different RRM requirements. It shows that the RRM resources provided by network functions of DU, CUUP, and CUCP are characterized by *RRMPolicyRatio* IOC with rRMPolicyMaxRatio, rRMPolicyMinRatio, and rRMPolicyDedicatedRatio attributes to define the shared resources, prioritized resources, and dedicated resources for network slice instance(s) (see clause 4.3.36.1 in TS 28.541 [13]).



Figure 8.3.3-2: RRM resources optimization procedure

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

159.    Verizon's 3GPP management system communicates Centralized Capacity and Coverage Optimization (CCO) control parameters to gNBs, based on performance measurements.

### Table 7.2.3.3.1-1. CCO related performance measurements

| Performance measurements | Description |
| --- | --- |
| Distribution of SS-RSRP per SSB | Provides the distribution of SS_RSRP per SSB (see clause 5.1.1.22.1 in TS 28.552 [5]). |
| Distribution of SS-RSRQ | Provides the distribution of SS_RSRQ (see clause 5.1.1.31.1 in TS 28.552 [5]). |
| Distribution of the number of active UE per SSB | Provides the distribution of the number of active UE per SSB. |
| Number of requested handover executions | Provides the number of requested handover executions (see clause 5.1.1.6.1.7 in TS 28.552 [5]). |
| Number of failed handover executions | Provides the number of failed handover executions (see clause 5.1.1.6.1.9 in TS 28.552 [5]). |
| Distribution of DL Total PRB Usage | Provides the distribution of samples with total usage (in percentage) of PRBs on the downlink in different ranges (see clause 5.1.1.2.3 in TS 28.552 [5]). |
| Distribution of UL Total PRB Usage | Provides the distribution of samples with total usage (in percentage) of PRBs on the uplink in different ranges (see clause 5.1.1.2.4 in TS 28.552 [5]). |
| DL PRB used for data traffic | Provides the number of PRBs in average used in downlink for data traffic (see clause 5.1.1.2.5 in TS 28.552 [5]). |
| DL total available PRB | provides the total number of PRBs in average available downlink (see clause 5.1.1.2.6 in TS 28.552 [5]). |
| UL PRB used for data traffic | Provides the number of PRBs in average used in uplink for data traffic (see clause 5.1.1.2.7 in TS 28.552 [5]). |
| UL total available PRB | Provides the total number of PRBs in average available uplink (see clause 5.1.1.2.8 in TS 28.552 [5]). |
| Average DL UE throughput in gNB | Provides the average UE throughput in downlink (see clause 5.1.1.3.1 in TS 28.552 [5]). |
| Distribution of DL UE throughput in gNB | Provides the distribution of the UE throughput in downlink (see clause 5.1.1.3.1 in TS 28.552 [5]). |

Table 7.2.3.2.1-1 defines the CCO control parameters to be updated by C-SON function.

### Table 7.2.3.2.1-1: CCO control parameters

| Control parameters | Definition | Note |
| --- | --- | --- |
| Configured max Tx power | Represents the maximum transmission power in milliwatts (mW) at the antenna port for all downlink channels, used simultaneously in a cell, added together. See attribute configuredMaxTxPower in TS 28.541 [13]. | |
| Configured Max Tx EIRP | Represents the maximum emitted isotropic radiated power (EIRP) in dBm for all downlink channels, used simultaneously in a cell, added together. See attribute configuredMaxTxEIRP in TS 28.541 [13]. | |
| Coverage shape | Identifies the sector carrier coverage shape described by the envelope of the contained SSB beams. See attribute coverageShapen in TS 28.541 [13]. | |
| Digital tilt | Represents the vertical pointing direction of the antenna relative to the antenna bore sight, representing the total non-mechanical vertical tilt of the selected coverageShape. See attribute digitalTilt in TS 28.541 [13]. | |
| Digital azimuth | Represents the horizontal pointing direction of the antenna relative to the antenna bore sight, representing the total non-mechanical horizontal pan of the selected coverageShape. See attribute digitalAzimuth in TS 28.541 [13]. | |

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf.

**Verizon infringes the '092 patent.**

160.    Verizon infringes many claims of the '092 patent including at least claims 1, 3, 4, 10, 11, 12, 13, 16, and 17 by operating and providing access to Verizon's 5G systems that virtualize physical cellular radio access nodes. Exemplary network functions virtualized by Verizon include traffic and bandwidth management and allocation and quality of service (QoS) monitoring and management.

161.    In the Verizon 5G network, the gNB-CU and DU are virtualized and connected to the Radio Units (RUs) or Remote Radio Heads (RRHs) (i.e., the *physical cellular access nodes*) via a control plane interface, referred to as the fronthaul. The fronthaul network is implemented with, e.g., the Common Public Radio Interface (CPRI).

## 4.1    General concepts

The 5G System architecture is defined to support data connectivity and services enabling deployments to use techniques such as e.g. Network Function Virtualization and Software Defined Networking. The 5G System architecture shall leverage service-based interactions between Control Plane (CP) Network Functions where identified. Some key principles and concept are to:

-    Separate the User Plane (UP) functions from the Control Plane (CP) functions, allowing independent scalability, evolution and flexible deployments e.g. centralized location or distributed (remote) location.

https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/18.06.00_60/ts_123501v180600p.pdf

### 6.2.2.2    Function description

Centralized/Cloud RAN (CRAN) takes a different architectural approach in RAN (Radio Access Network) design by centralizing and aggregating the baseband processing of the radio nodes.

The 5G CRAN architecture consists of Remote Radio Head (RRH) units co-located with antennas on towers or poles, connected to a centrally controlled and virtualised pool of Baseband Units (BBUs) over a fronthaul network. The baseband processing is shared by several remote radio sites. This architecture enables the implementation of advanced coordination techniques such as CoMP.

The traditional fronthaul network is implemented with the Common Public Radio Interface (CPRI) over optical fiber links. CPRI is a full duplex synchronous protocol that defines three different logical connections between the Radio Equipment Controller REC and the Radio equipment RE: user plane data, control and management plane, and timing synchronization. CPRI requires tight synchronization accuracy between REC and RE. The clock received at the RE needs to be traceable to the main REC clock with an accuracy of 8.138 ns. In this traditional CPRI deployment, the RRHs are in charge of all radio functions and the BBUs are responsible for all the higher layer functionalities.

https://www.etsi.org/deliver/etsi_gr/NFV-SEC/001_099/016/01.01.01_60/gr_NFV-SEC016v010101p.pdf



**Figure 6.2.2.2-1: C-RAN architecture**

162.    Verizon implements virtualization of the gNB-CU-CP (Central Unit-Control Plane) to allocate and optimize traffic across cells and gNodeBs (e.g., a first virtualized network function) in the RAN.

163.    Open RAN (O-RAN) refers to the fronthaul connection between the O-DU and the O-RU as LLS interface, which transport control plane traffic in the Verizon network.

### 4.1.1    Architectural entities

The architecture of eNB or gNB with O-DU and O-RUs is shown in Figure 4.1.1-1. LLS-C and LLS-U provide C-Plane and U-Plane over LLS interface, respectively.

**Fronthaul:** A logical link connecting O-DU and O-RU.

  NOTE:    Fronthaul transports C-Plane, U-Plane, S-Plane and M-Plane traffic.



**Figure 4.1.1-1: eNB/gNB architecture with O-DU and O-RUs**

https://www.etsi.org/deliver/etsi_ts/103800_103899/103859/12.00.01_60/ts_103859v120001p.pdf

164.    The eCPRI standard defines the fronthaul network connecting the generic Radio Equipment (eRE) and Radio Equipment Controller (eREC), to account for different functional splits between the physical and virtualized components of the gNB. The eCPRI fronthaul network is used to exchange control information between the eREC and the eRE.

https://www.cpri.info/downloads/eCPRI_v_2.0_2019_05_10c.pdf

165.    Verizon's 5G radio access network (RAN) is comprised of gNBs that provide a connection point for UEs into the network. The functionality of gNBs is logically divided into a Central Unit –Control Plane (gNB-CU-CP), a Central Unit –User Plane (gNB-CU-UP), and one or

more Distributed Units (gNB-DU). This functional split allows gNBnetwork functions to be virtualized, i.e., to support Verizon's vRAN.

gNB: node providing NR user plane and control plane protocol terminations towards the UE, and connected via the NG interface to the 5GC.



**Figure 6.1.2-1. Overall architecture for separation of gNB-CU-CP and gNB-CU-UP**

https://www.etsi.org/deliver/etsi_ts/138400_138499/138401/16.07.00_60/ts_138401v160700p.pdf

## 4.1    NR and NG-RAN deployment scenarios

According to NG-RAN architecture defined in 3GPP TS 38.300 [3], An NG-RAN node is either a gNB or an ng-eNB connected to 5GC.

A gNB may consist of a gNB-CU and one or more gNB-DU(s), and a gNB-CU may consist of a gNB-CU-CP and one or more gNB-CU-UP. From functional split point of view, there have following gNB deployment scenarios which are specified in 3GPP TS 38.401 [4]:

1) gNB which does not consist split function.

2) gNB which consists of gNB-CU and gNB-DU(s).

3) gNB which consists of gNB-CU-CP, gNB-CU-UP(s) and gNB-DU(s).

Abovementioned deployment scenarios apply to en-gNB also.

Part of gNB (e.g. gNB-CU) can be deployed as virtualized network function.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128540/17.02.00_60/ts_128540v170200p.pdf

166.    Verizon's O-RAN implementation divides gNB functionality into four components:

O-CU-CP, O-CU-UP, O-DU, and O-RU (Radio Unit). O-RAN virtualizes all of these functions in

the O-Cloud, except for the O-RU. The Service Management and Orchestration (SMO) Framework

performs the RAN Management Functions in the O-RAN architecture.

---

6.3.1.2.1        Introduction to SMO Functionality

This clause describes the functionality provided by the SMO in O-RAN. In a Service Provider's Network, there can be many management domains such as RAN management, Core Management, Transport Management, End to End Slice Management, etc. In the O-RAN architecture, SMO is responsible for RAN domain management. The SMO description in this architecture document is focused on the SMO services that support the RAN. The key capabilities of the SMO that provide RAN support in O-RAN are:

---

https://www.etsi.org/deliver/etsi_ts/103900_103999/103982/08.00.00_60/ts_103982v080000p.pdf

---

A key principle is the decoupling of RAN hardware and software for all components including near-RT RIC, O-CU (O-CU-CP and O-CU-UP), O-DU, and O-RU, and the deployment of software components on commodity server architectures supplemented with programmable accelerators where necessary.

---

-   The O-Cloud Platform is a set of hardware and software components that provide O-Cloud Capabilities and services to execute RAN network functions.

-   The O-Cloud Platform hardware includes compute, networking and storage components, and can also include various acceleration technologies required by the RAN network functions to meet their performance objectives.

-   The O-Cloud Platform software exposes open and well-defined APIs that enable the orchestration and management of the NF Deployment's life cycle.

-   The O-Cloud Platform software exposes open and well-defined APIs that enable the orchestration and management of the O-Cloud.

-   The O-Cloud Platform software is decoupled from the O-Cloud Platform hardware (i.e., it can typically be sourced from different vendors).

---

O-RAN Working Group 6 Cloud Architecture and Deployment Scenarios for O-RAN Virtualized RAN, (accessible at https://specifications.o-ran.org/download?id=817)



Figure 6.1-2: Logical Architecture of O-RAN

https://www.etsi.org/deliver/etsi_ts/103900_103999/103982/08.00.00_60/ts_103982v080000p.pdf

167.   Verizon's 5G network features service and network slice orchestration, policy-driven closed-loop automation, analytics, and RAN intelligent control to monitor and enforce Quality-of-Service and QoS across RAN, transport, and core. These capabilities run on an ONAP-based orchestration stack and Open RAN controllers, enabling dynamic resource allocation and SLA/QoS management via 5G SA network slicing and automation.

168.   For service level orchestration, Verizon utilizes the Samsung Cloud Orchestration layer to manage end-to-end service. Using information from the analytics module that collects, analyzes, and optimizes the services, service and E2E orchestrators provide service fulfillment and assurance by providing resource components to the Communication Service Management Function (CSMF) and Network Slice Management Function (NSMF).

169.     Verizon's virtualized gNB-CU-CP hosts the RRC protocol and control-plane part of the PDCP protocol. The gNB-CU-CP (a *first virtualized network function*) is responsible for allocating traffic among the components of the 5G Radio Access Network (RAN). This includes, e.g., UE mobility, as well as the addition or modification of carrier aggregation and Dual Connectivity.

**gNB-CU-Control Plane (gNB-CU-CP):** a logical node hosting the RRC and the control plane part of the PDCP protocol of the gNB-CU for an en-gNB or a gNB. The gNB-CU-CP terminates the E1 interface connected with the gNB-CU-UP and the F1-C interface connected with the gNB-DU.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138331/18.03.00_60/ts_138331v180300p.pdf

# 7.1        Services and Functions

The main services and functions of the RRC sublayer over the Uu interface include:

- Establishment, maintenance and release of an RRC connection between the UE and NG-RAN including:

  - Addition, modification and release of carrier aggregation;

  - Addition, modification and release of Dual Connectivity in NR or between E-UTRA and NR.

- Mobility functions including:

  - Handover and context transfer;

  - UE cell selection and reselection and control of cell selection and reselection;

  - Inter-RAT mobility.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

170.     The gNB-CU-CP receives measurement reports from the UE via the fronthaul interface, which it analyzes as part of handover decisions to balance load and optimize the allocation of traffic across cells and gNBs.

## 9    Mobility and State Transitions

### 9.1    Overview

Load balancing is achieved in NR with handover, redirection mechanisms upon RRC release and through the usage of inter-frequency and inter-RAT absolute priorities and inter-frequency Qoffset parameters.

Measurements to be performed by a UE for connected mode mobility are classified in at least four measurement types:

- Intra-frequency NR measurements;

- Inter-frequency NR measurements;

- Inter-RAT measurements for E-UTRA;

- Inter-RAT measurements for UTRA.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

171.    Verizon's virtualized gNB-CU-CP optimizes traffic allocation in the RAN by setting up multiple simultaneous connections between the network and the UE, using, e.g., carrier aggregation and dual connectivity. The gNB-CU-CP can then allocate PDU sessions and QoS flows between the master and secondary gNBs (MN and SN).

### 4.1.3    MR-DC with the 5GC

#### 4.1.3.1    E-UTRA-NR Dual Connectivity

NG-RAN supports NG-RAN E-UTRA-NR Dual Connectivity (NGEN-DC), in which a UE is connected to one ng-eNB that acts as a MN and one gNB that acts as a SN.

#### 4.1.3.2    NR-E-UTRA Dual Connectivity

NG-RAN supports NR-E-UTRA Dual Connectivity (NE-DC), in which a UE is connected to one gNB that acts as a MN and one ng-eNB that acts as a SN.

In MR-DC with 5GC, the following principles apply:

- The MN decides per PDU session the location of the SDAP entity, i.e. whether it shall be hosted by the MN or the SN or by both (split PDU session);

- If the MN decides to host an SDAP entity it may decide some of the related QoS flows to be realized as MCG bearer, some as SCG bearer, and others to be realized as split bearer;

- If the MN decides that an SDAP entity shall be hosted in the SN, some of the related QoS flows may be realized as SCG bearer, some as MCG bearer, while others may be realized as split bearer. In this case, the SN decides how to realise the QoS flow, but if the MN does not offer MCG resources, the SN can only realize the QoS flow as SCG bearer. The SN may remove or add SCG resources for the respective QoS flows, as long as the QoS for the respective QoS flow is guaranteed

https://www.etsi.org/deliver/etsi_ts/137300_137399/137340/18.01.00_60/ts_137340v180100p.pdf

172.  Verizon's virtualized gNB-CU-CP allocates Protocol Data Unit (PDU) sessions and QoS flows (manageable traffic streams) between master and secondary g-NodeBs.

173.  Verizon implements virtual network functions to ensure End-to-End QoS management, which enables Verizon to provide network slicing services.

174.  Verizon's virtualized gNB-CU-CP uses RRC reconfiguration messages to instruct the UE regarding the addition or modification of the SN connection and user plane resource configuration.



**Figure 10.3.2-1: SN Modification procedure - MN initiated**

https://www.etsi.org/deliver/etsi_ts/137300_137399/137340/18.01.00_60/ts_137340v180100p.pdf

175. Verizon's virtualized gNB-DU hosts the MAC layer of the gNB, which includes dynamic resource schedulers to allocate radio resources, called resource blocks, for the downlink and uplink. Schedulers account for information received from the UE, including, for example, UE buffer status and radio conditions.

## 10.1    Basic Scheduler Operation

In order to utilise radio resources efficiently, MAC in gNB includes dynamic resource schedulers that allocate physical layer resources for the downlink and the uplink. In this clause, an overview of the scheduler is given in terms of scheduler operation, signalling of scheduler decisions, and measurements.

Scheduler Operation:

-    Taking into account the UE buffer status and the QoS requirements of each UE and associated radio bearers, schedulers assign resources between UEs;

-    Schedulers may assign resources taking account the radio conditions at the UE identified through measurements made at the gNB and/or reported by the UE;

-    Resource assignment consists of radio resources (resource blocks).

Signalling of Scheduler Decisions:

-    UEs identify the resources by receiving a scheduling (resource assignment) channel.

Measurements to Support Scheduler Operation:

-    Uplink buffer status reports (measuring the data that is buffered in the logical channel queues in the UE) are used to provide support for QoS-aware packet scheduling;

-    Power headroom reports (measuring the difference between the nominal UE maximum transmit power and the estimated power for uplink transmission) are used to provide support for power aware packet scheduling.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

176.    Verizon's virtualized gNB-DU communicates scheduling information to UEs using

Downlink Control Information (DCI) over the Physical Downlink Control Channel (PDDCH).

## 10.2     Downlink Scheduling

In the downlink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible assignments when its downlink reception is enabled (activity governed by DRX and cell DTX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

## 10.3     Uplink Scheduling

In the uplink, the gNB can dynamically allocate resources to UEs via the C-RNTI on PDCCH(s). A UE always monitors the PDCCH(s) in order to find possible grants for uplink transmission when its downlink reception is enabled (activity governed by DRX and cell DTX when configured). When CA is configured, the same C-RNTI applies to all serving cells.

## 5.2.3     Physical downlink control channels

The Physical Downlink Control Channel (PDCCH) can be used to schedule DL transmissions on PDSCH and UL transmissions on PUSCH, where the Downlink Control Information (DCI) on PDCCH includes:

- Downlink assignments containing at least modulation and coding format, resource allocation, and hybrid-ARQ information related to DL-SCH;

- Uplink scheduling grants containing at least modulation and coding format, resource allocation, and hybrid-ARQ information related to UL-SCH.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

177.    Verizon's virtualized gNB-DU controls bandwidth allocation (a *second virtualized function*). One of up to four configured Bandwidth Parts (BWP) is active for a UE at any given time. Bandwidth Adaptation (BA) allows Verizon's network to optimize bandwidth allocation for, e.g., power saving, scheduling flexibility, and different services.

## 6.10     Bandwidth Adaptation

With Bandwidth Adaptation (BA), the receive and transmit bandwidth of a UE need not be as large as the bandwidth of the cell and can be adjusted: the width can be ordered to change (e.g. to shrink during period of low activity to save power); the location can move in the frequency domain (e.g. to increase scheduling flexibility); and the subcarrier spacing can be ordered to change (e.g. to allow different services). A subset of the total cell bandwidth of a cell is referred to as a Bandwidth Part (BWP) and BA is achieved by configuring the UE with BWP(s) and telling the UE which of the configured BWPs is currently the active one.

Figure 6.10-1 below describes a scenario where 3 different BWPs are configured:

- $BWP_1$ with a width of 40 MHz and subcarrier spacing of 15 kHz;
- $BWP_2$ with a width of 10 MHz and subcarrier spacing of 15 kHz;
- $BWP_3$ with a width of 20 MHz and subcarrier spacing of 60 kHz.



**Figure 6.10-1: BA Example**

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

178.    Verizon's virtualized gNB-DU controls activation of up to four configured Bandwidth Parts (BWP) for a UE at any given time. The active BWP is configured in a DCI message.

A UE receives PDCCH and PDSCH in a DL BWP according to a configured SCS and CP length for the DL BWP. A UE transmits PUCCH and PUSCH in an UL BWP according to a configured SCS and CP length for the UL BWP.

If a bandwidth part indicator field is configured in a DCI format, the bandwidth part indicator field value indicates the active DL BWP, from the configured DL BWP set, for DL receptions as described in [5, TS 38.212]. If a bandwidth part indicator field is configured in a DCI format, the bandwidth part indicator field value indicates the active UL BWP, from the configured UL BWP set, for UL transmissions as described in [5, TS 38.212].

https://www.etsi.org/deliver/etsi_ts/138200_138299/138213/18.04.00_60/ts_138213v180400p.pdf

### 4.4.5    Bandwidth part

A bandwidth part is a subset of contiguous common resource blocks defined in clause 4.4.4.3 for a given numerology $\mu_i$ in bandwidth part $i$ on a given carrier. The starting position $N_{\text{BWP},i}^{\text{start},\mu}$ and the number of resource blocks $N_{\text{BWP},i}^{\text{size},\mu}$ in a bandwidth part shall fulfil $N_{\text{grid},x}^{\text{start},\mu} \leq N_{\text{BWP},i}^{\text{start},\mu} < N_{\text{grid},x}^{\text{start},\mu} + N_{\text{grid},x}^{\text{size},\mu}$ and $N_{\text{grid},x}^{\text{start},\mu} < N_{\text{BWP},i}^{\text{start},\mu} + N_{\text{BWP},i}^{\text{size},\mu} \leq N_{\text{grid},x}^{\text{start},\mu} + N_{\text{grid},x}^{\text{size},\mu}$, respectively. Configuration of a bandwidth part is described in clause 12 of [5, TS 38.213].

A UE can be configured with up to four bandwidth parts in the downlink with a single downlink bandwidth part being active at a given time. The UE is not expected to receive PDSCH, PDCCH, or CSI-RS (except for RRM) outside an active bandwidth part.

A UE can be configured with up to four bandwidth parts in the uplink with a single uplink bandwidth part being active at a given time. If a UE is configured with a supplementary uplink, the UE can in addition be configured with up to four bandwidth parts in the supplementary uplink with a single supplementary uplink bandwidth part being active at a given time. The UE shall not transmit PUSCH or PUCCH outside an active bandwidth part. For an active cell, the UE shall not transmit SRS outside an active bandwidth part.

https://www.etsi.org/deliver/etsi_ts/138200_138299/138211/18.02.00_60/ts_138211v180200p.pdf

179.    Verizon's virtualized gNB-CU-UP hosts the user plane part of the PDCP protocol and the SDAP protocol in the RAN. The SDAP sublayer is responsible (i.e., via *a third virtualized network function*) for mapping QoS flows to radio bearers, each of which is associated with a particular UE.

**gNB-CU-User Plane (gNB-CU-UP):** a logical node hosting the user plane part of the PDCP protocol of the gNB-CU for an en-gNB, and the user plane part of the PDCP protocol and the SDAP protocol of the gNB-CU for a gNB. The gNB-CU-UP terminates the E1 interface connected with the gNB-CU-CP and the F1-U interface connected with the gNB-DU.

https://www.etsi.org/deliver/etsi_ts/138400_138499/138401/15.02.00_60/ts_138401v150200p.pdf

## 6.5    SDAP Sublayer

The main services and functions of SDAP include:

-    Mapping between a QoS flow and a data radio bearer;

-    Marking QoS flow ID (QFI) in both DL and UL packets.

A single protocol entity of SDAP is configured for each individual PDU session.

> Except for NB-IoT, IAB-MT in SA mode, and NCR-MT, for each UE, the NG-RAN establishes at least one Data Radio Bearers (DRB) together with the PDU Session and additional DRB(s) for QoS flow(s) of that PDU session can be subsequently configured (it is up to NG-RAN when to do so);

> At **Access Stratum** level, the data radio bearer (DRB) defines the packet treatment on the radio interface (Uu). A DRB serves packets with the same packet forwarding treatment. The QoS flow to DRB mapping by NG-RAN is based on QFI and the associated QoS profiles (i.e. QoS parameters and QoS characteristics). Separate DRBs may be established for QoS flows requiring different packet forwarding treatment, or several QoS Flows belonging to the same PDU session can be multiplexed in the same DRB.

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

180.    In the Verizon 5G network, the SDAP sublayer is responsible for mapping QoS flows (i.e., *analyzes at least a third portion of the data and generates a third instruction related to quality of service assignment to a first cellular terminal within the cellular network*) to radio bearers, each of which is associated with a particular UE.



Figure 4.2.2-1: SDAP layer, functional view

https://www.etsi.org/deliver/etsi_ts/137300_137399/137324/17.00.00_60/ts_137324v170000p.pdf



Figure 12-1: QoS architecture

https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/18.01.00_60/ts_138300v180100p.pdf

181. The gNB-CU-UP's QoS flow to DRB mapping considers both the resource situation, and the priority level and pre-emption indicators associated with each QoS flow.



https://www.etsi.org/deliver/etsi_ts/138400_138499/138401/16.07.00_60/ts_138401v160700p.pdf

The following functions are provided by the NR user plane protocol:

- Provision of NR user plane specific sequence number information for user data transferred from the node hosting NR PDCP to the corresponding node for a specific data radio bearer.

- Information of successful in sequence delivery of NR PDCP PDUs to the UE from the corresponding node for user data associated with a specific data radio bearer.

- Information of successful in sequence delivery of NR PDCP PDUs to the UE from the corresponding node for retransmission user data associate with a specific data radio bearer;

- Information on Radio Link Quality from the corresponding node for user data associated with a specific data radio bearer.

- Information for QoS monitoring from the corresponding node for user data associated with a specific data radio bearer.

https://www.etsi.org/deliver/etsi_ts/138400_138499/138425/16.01.00_60/ts_138425v160100p.pdf

For each QoS flow requested to be setup the NG-RAN node shall take into account the received *QoS Flow Level QoS Parameters* IE. For each QoS flow the NG-RAN node shall establish or modify the resources according to the values of the *Allocation and Retention Priority* IE (priority level and pre-emption indicators) and the resource situation as follows:

- The NG-RAN node shall consider the priority level of the requested QoS flow, when deciding on the resource allocation.

- The priority levels and the pre-emption indicators may (individually or in combination) be used to determine whether the QoS flow setup has to be performed unconditionally and immediately. If the requested QoS flow is marked as "may trigger pre-emption" and the resource situation requires so, the NG-RAN node may trigger the pre-emption procedure which may then cause the forced release of a lower priority QoS flow which is marked as "pre-emptable". Whilst the process and the extent of the pre-emption procedure are operator-dependent, the pre-emption indicators shall be treated as follows:

    1. The values of the last received *Pre-emption Vulnerability* IE and *Priority Level* IE shall prevail.

    2. If the *Pre-emption Capability* IE is set to "may trigger pre-emption", then this allocation request may trigger the pre-emption procedure.

https://www.etsi.org/deliver/etsi_ts/138400_138499/138413/16.09.00_60/ts_138413v160900p.pdf

182.    In the Verizon 5G network, the virtualized gNB-CU-UP receives, e.g., Radio Quality Assistance Information (i.e. *receives at least a third portion of the data*) based on the UE's measurements from the gNB-DU for user plan management and optimization procedures.

### 5.4.3    Transfer of Assistance Information

#### 5.4.3.1    Successful operation

The purpose of the Transfer of Assistance Information procedure is to provide assistance information to the node hosting the NR PDCP entity. Such information may be taken into consideration by the node hosting the NR PDCP entity for UP management and optimisation procedures.

An NR user plane protocol instance making use of the Transfer of Assistance Information procedure is associated to a single data radio bearer only.

The ASSISTANCE INFORMATION DATA frame may include one or more Radio Quality Assistance Information. The information shall consist of the information indicated in the Assistance Information Type.



**Figure 5.4.3.1-1: Successful Transfer of Assistance Information Data**

#### 5.5.3.38    Assistance Information Type

**Description:** This field describes the type of radio quality assistance information provided, if supported, by the corresponding node to the node hosting the NR PDCP entity. The DL Radio Quality Index is a numerical index expressing the radio quality of the data radio bearer or the RLC entity in DL, where the value 0 represents the lowest quality. The UL Radio Quality Index is a numerical index expressing the radio quality of the data radio bearer or the RLC entity in UL, where the value 0 represents the lowest quality. The averaging window for the Average CQI, Average HARQ Failure and Average HARQ Retransmission is set by means of configuration. Power Headroom Report is PHR MAC control element reported by as defined in 3GPP TS 36.321[4] and 3GPP TS 38.321[5]

https://www.etsi.org/deliver/etsi_ts/138400_138499/138425/16.01.00_60/ts_138425v160100p.pdf

183.    Instructions from the RRC, SDAP/PDCP, and MAC layers (i.e., *the control plane interface transmits the first, second and third instructions to the physical cellular access node*) are transmitted to the RU (or RRH) over the fronthaul interface to control downlink or uplink transmissions.





https://www.etsi.org/deliver/etsi_ts/138300_138399/138300/15.14.00_60/ts_138300v151400p.pdf



**Figure 5.1.1-1: O-RAN WG4 FH functional split**

**O-RAN.WG4.TS.MP.0-R004-v17.01** accessible at https://specifications.o-ran.org/download?id=857

184.    As illustrated below, the RU (or RRH) hosts the low physical layer and RF functions.



Figure 4: Fronthaul Network definition



eCPRI Specification 10 V2.0 (accessible at
https://www.cpri.info/downloads/eCPRI_v_2.0_2019_05_10c.pdf)



Figure 4.1.1-1: eNB/gNB architecture with O-DU and O-RUs

https://www.etsi.org/deliver/etsi_ts/103800_103899/103859/12.00.01_60/ts_103859v120001p.pdf.

**Verizon Infringes the '059 patent**

185.    Verizon infringes many claims of the '059 patent including at least claims 1, 5, 6, 7, 8, 9, 11, and 16 by providing and using Verizon's 3GPP Management System which consists of logical management functions (MFs) in the control plane, some of which represent corresponding data-plane objects (e.g., RAN domain MF and core network MF).

"Request-response": A Control Plane NF_B (NF Service Producer) is requested by another Control Plane NF_A (NF Service Consumer) to provide a certain NF service, which either performs an action or provides information or both. NF_B provides an NF service based on the request by NF_A. In order to fulfil the request, NF_B may in turn consume NF services from other NFs. In Request-response mechanism, communication is one to one

https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/17.05.00_60/ts_123501v170500p.pdf



**Figure A.1.1: Example management layers in layered management model**

## 4.5    Management Function (MnF) concept

A Management Function (MnF) is a logical entity playing the roles of MnS consumer and/or MnS producer.

A Management Service produced by MnF may have multiple consumers. The MnF may consume multiple Management Services from one or multiple Management Service producers. An example of a MnF playing both roles (Management Service producer and consumer) illustrated in the figure 4.5.1 below.

Management Function can be deployed as a separate entity or embedded in Network Function to provide MnS(s). Following figure 4.5.2 shows an example (on the left) which MnF deployed as a separate entity to provide MnS(s) and another example (on the right) which MnF is embedded in Network Function to provide MnS(s):



**Figure 4.5.2 Examples of MnS deployment scenario**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

186.    These MFs chain together to create network slices that provide end-to-end service guarantees.

## 4.4    Managed network slice concepts

From a management point of view a network slice is complete in the sense that it includes all the network function instances, with their supporting resources, to provide service for certain business purpose (e.g. to support a certain set of communication services, provide PNI-NPNs, etc. in NSaaS model) or operational efficiencies purpose (e.g. to optimize operator internal O&M procedures in network slice as NOP internals model). In other words, the network slice is complete because it completely satisfies the associated SLS.

The following concepts are related to network slicing management:

  a.  Services which are supported by network slices (services whose service level requirements are satisfied by the SLS associated with the network slices).

  b.  Network slice subnet instances and networks composed of PNF, VNF or both and offered as network slices.

  c.  Network function (PNFs, VNFs) grouped into network slice subnets.

  d.  Resources which support the network (e.g. virtualized resource, non-virtualized resource)

The 3GPP management system maintains the network topology and the related QOS requirements.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf



Figure A.8.1: An example of deployment scenario for management of a mobile network including network slicing

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

187.    Verizon's 3GPP Management System collects diagnostic data, measuring the performance of each network slice and its constituent parts.

Table 7.2.2.3.1-1. RRM related performance measurements

| Performance measurements | Description | Note |
|---|---|---|
| Mean DL PRB used for data traffic | Provides the mean number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.5 in TS 28.552 [5]). | |
| Peak DL PRB used for data traffic | Provides the peak number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.9 in TS 28.552 [5]).. | |

**ETSI**

3GPP TS 28.313 version 17.4.0 Release 17          44          ETSI TS 128 313 V17.4.0 (2022-05)

| Performance measurements | Description | Note |
|---|---|---|
| Mean UL PRB used for data traffic | Provides the mean number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.7 in TS 28.552 [5]). | |
| Peak UL PRB used for data traffic | Provides the peak number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.10 in TS 28.552 [5]).. | |
| Average DL UE throughput in gNB | Provides the average UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.1 in TS 28.552 [5]). | |
| Distribution of DL UE throughput in gNB | Provides the distribution of the UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.2 in TS 28.552 [5]). | |
| Average UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.3 in TS 28.552 [5]). | |
| Distribution of UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.4 in TS 28.552 [5]). | |
| Mean number of Active UEs in the DL per cell | Provides the mean number of active UEs in downlink in an NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.23.1 in TS 28.552 [5]). | |

5.2    Performance measurements for AMF

5.3    Performance measurements for SMF

5.4    Performance measurements for UPF

5.5    Performance measurements for PCF

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

188.    Verizon's 3GPP management system collects core network diagnostic data through the Network Data Analytics Function (NWDAF) and RAN performance measurements at the network function, network slice subnet, and network slice levels.

---

The NWDAF provides analytics to 5GC NFs and OAM as defined in clause 7. An NWDAF may contain the following logical functions:

- **Analytics logical function (AnLF):** A logical function in NWDAF, which performs inference, derives analytics information (i.e. derives statistics and/or predictions based on Analytics Consumer request) and exposes analytics service i.e. Nnwdaf_AnalyticsSubscription or Nnwdaf_AnalyticsInfo.

- **Model Training logical function (MTLF):** A logical function in NWDAF, which trains Machine Learning (ML) models and exposes new training services (e.g. providing trained ML Model) as defined in clause 7.5 and clause 7.6.

## 6.3.3A    Output analytics

The NWDAF services as defined in the clause 7.2 and 7.3 are used to expose the following analytics:

-    Network Slice instance load statistics information as defined in Table 6.3.3A-1.

-    Network Slice load statistics information as defined in Table 6.3.3A-2.

-    Network Slice instance load predictions information as defined in Table 6.3.3A-3.

-    Network Slice load predictions information as defined in Table 6.3.3A-4.

---

https://www.etsi.org/deliver/etsi_ts/123200_123299/123288/18.05.00_60/ts_123288v180500p.pdf

189.    Verizon's 3GPP management system is an orchestrator that operates in the control plane and includes management functions in various parts of the network that perform closed loop SLS assurance, such as Self-Organizing Network (SON) algorithms (i.e., via *a processor that executes instructions*).



Figure 4.4.1.1: Example of a network slice

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/16.06.00_60/ts_128530v160600p.pdf

Figure 4.1.2.1-1 shows a generic C-SON process, where the SON algorithms execute in the 3GPP management system interact with network functions in RAN and/or CN to implement SON functions. The SON algorithm may consist of the following functionalities:

- Monitoring: monitor the network(s) by collecting management data, including the data provided by MDAS.

- Analysis: analyse the management data to determine if there are issues in the network(s) that need to be resolved.

- Decision: makes the decision on the SON actions to resolve the issues.

- Execution: execute the SON actions.

- Evaluation: evaluate whether the issues have been solved by analysing the management data

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

190.    In response to receiving QoS diagnostic data, the 3GPP management system creates,

modifies, or reconstitutes a network slice that provides end-to-end service guarantees.

### 5.1.2    Network slicing management

**REQ-3GPPMS-CON-01** The 3GPP management system shall have the capability to create a new or use an existing NetworkSlice instance according to the communication service requirements.

**REQ-3GPPMS-CON-02** The 3GPP management system shall have the capability to translate the communication service requirements to network slice related requirements.

**REQ-3GPPMS-CON-03** The 3GPP management system shall have the capability to create a new or use an existing NetworkSlice instance according to the network slice related requirements

NOTE:    The network slice related requirements include requirements such as: area traffic capacity, charging, coverage area, degree of isolation, end-to-end latency, mobility, overall user density, priority, service availability, service reliability, UE speed.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/16.06.00_60/ts_128530v160600p.pdf

191.    The 3GPP management system sends commands through the chain of management functions, from the NSMF to the network slice's constituent NSSMFs, and from the NSSMFs to the subnets' constituent NF provisioning services.



https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf



Figure 7.7-1: Network Slice Subnet Instance Modification Request procedure

1) Network Slice Subnet Management Service Provider (NSSM_SP) receives a ModifyNssi request (see modifyMOIAttributes operation defined in TS 28.532 [8]) from Network Slice Subnet Management Service Consumer (NSSM_SC) with the management identifier of NSSI and the new network slice subnet related requirements (see SliceProfile defined in clause 6.3.3 in TS 28.541[6]).

2) Based on the new network slice subnet related requirements, NSSM_SP invokes the feasibility check procedure. If the modification requirements can be satisfied, go to step 3), else go to step 5).

3) NSSM_SP decomposes the NSSI modification request into modification requests for each NSSI constituent.

4a) If the requested NSSI constituent is constituent NSSI, NSSM_SP invokes NSSI modification procedure as described in clause 7.7.

4b) If the requested NSSI constituent is NF instance, NSSM_SP invokes NF creation procedure as described in clause 7.10 or NF modification procedure as described in clause 7.11.

4c) If the NSSI contains the virtualized part, NSSM_SP invokes the NS instance scaling and/or NS instance updating and/or NS instance instantiation procedure as described in TS 28.526 [7].

4d) If the NSSI contains the TN part, NSSM_SP invokes the TN related coordination procedure as described in clause 7.9.

5) NSSM_SP sends NSSI modification results (see modifyMOIAttributes operation defined in TS 28.532 [8]) to NSSM_SC.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/16.07.00_60/ts_128531v160700p.pdf

192.    The 3GPP management system assigns classes of service, or network slices (each corresponding to its respective sNSSAI), to, e.g., gNBs. Each sNSSAI is then associated with a policy that defines how resources are shared and prioritized.

### 6.1.2.2      Management

The 5G system shall allow the operator to create, modify, and delete a network slice.

The 5G system shall allow the operator to define and update the set of services and capabilities supported in a network slice.

The 5G system shall enable the network operator to define a priority order between different network slices in case multiple network slices compete for resources on the same network.

The 5G system shall support means by which the operator can differentiate policy control, functionality and performance provided in different network slices.

The 5G system shall support scaling of a network slice, i.e. adaptation of its capacity.

### 6.1.2.2      Management

The 5G system shall allow the operator to create, modify, and delete a network slice.

The 5G system shall allow the operator to define and update the set of services and capabilities supported in a network slice.

The 5G system shall allow the operator to configure the information which associates a UE to a network slice.

The 5G system shall allow the operator to configure the information which associates a service to a network slice.

The 5G system shall allow the operator to assign a UE to a network slice, to move a UE from one network slice to another, and to remove a UE from a network slice based on subscription, UE capabilities, the access technology being used by the UE, operator's policies and services provided by the network slice.

The 5G system shall support a mechanism for the VPLMN, as authorized by the HPLMN, to assign a UE to a network slice with the needed services or to a default network slice.

The 5G system shall enable a UE to be simultaneously assigned to and access services from more than one network slice of one operator.

Traffic and services in one network slice shall have no impact on traffic and services in other network slices in the same network.

Creation, modification, and deletion of a network slice shall have no or minimal impact on traffic and services in other network slices in the same network.

The 5G system shall support scaling of a network slice, i.e. adaptation of its capacity.

The 5G system shall enable the network operator to define a minimum available capacity for a network slice. Scaling of other network slices on the same network shall have no impact on the availability of the minimum capacity for that network slice.

The 5G system shall enable the network operator to define a maximum capacity (e.g., number of UEs, number of data sessions)  for a network slice.

The 5G system shall enable the network operator to define a priority order between different network slices in case multiple network slices compete for resources on the same network.

The 5G system shall support means by which the operator can differentiate policy control, functionality and performance provided in different network slices.

https://www.etsi.org/deliver/etsi_ts/122200_122299/122261/17.11.00_60/ts_122261v171100p.pdf

## 7.2.2    RRM resources optimization for network slice instance(s)

### Table 7.2.x.2.1-1: RRM related parameters

| Control parameters | Definition | Legal Values |
|---|---|---|
| Maximum RRM policy ratio | This parameter specifies the maximum percentage of RRM resources used by the network slice instance(s). See attribute `rRMPolicyMaxRatio` in TS 28.541 [13]. | 0..100 |
| Minimum RRM policy ratio | This parameter specifies the minimum percentage of RRM resources used by the network slice instance(s). See attribute `rRMPolicyMinRatio` in TS 28.541 [13]. | 0..100 |
| Dedicated RRM policy ratio | This parameter specifies the maximum percentage of RRM resources that are dedicated to the network slice instance(s). See attribute `rRMPolicyDedicatedRatio` in TS 28.541 [13]. | 0..100 |

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

193.    The 3GPP management system assigns classes of service, or network slices (each corresponding to its respective sNSSAI), to, e.g., gNBs. Each sNSSAI is then associated with a policy that defines how resources are shared and prioritized.

### 4.3.42    RRMPolicyMember <<dataType>>

#### 4.3.42.1    Definition

This <<dataType>> represents an RRM Policy member that will be part of a `rRMPolicyMemberList`. A RRMPolicyMember is defined by its `pLMNId` and `sNSSAI` (S-NSSAI). The members in a `rRMPolicyMemberList` is assigned a specific amount of RRM resources based on settings in *RRMPolicy_*.

#### 4.3.42.2    Attributes

| Attribute name | S | isReadable | isWritable | isInvariant | isNotifyable |
|---|---|---|---|---|---|
| pLMNId | M | T | T | F | T |
| sNSSAI | CM | T | T | F | T |

https://www.etsi.org/deliver/etsi_ts/128500_128599/128541/17.06.00_60/ts_128541v170600p.pdf

### 8.3.3    RRM resources optimization for network slice instance(s)

Figure 8.3.3-1 depicts an example of network slice instances that are created to support various services, such as URLLC, eMBB, or mMTC with different RRM resources requirements, where network slice instances sNSSAI #2-1 and sNSSAI #2-2 support a kind of RRM requirements, while network slice instances sNSSAI #1 supports different RRM requirements. It shows that the RRM resources provided by network functions of DU, CUUP, and CUCP are characterized by *RRMPolicyRatio* IOC with `rRMPolicyMaxRatio`, `rRMPolicyMinRatio`, and `rRMPolicyDedicatedRatio` attributes to define the shared resources, prioritized resources, and dedicated resources for network slice instance(s) (see clause 4.3.36.1 in TS 28.541 [13]).



https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

194.    The sNSSAI assignments and policies are modified in real-time by sending a modifyMOIAttributes operation to appropriate provisioning MnS (i.e., *assigns classes of service (CoS) and resources across the VNFs to increase a service level and a bandwidth in real-time*).



Figure 7.11-1: Network Function Instance Modify procedure

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/18.05.00_60/ts_128531v180500p.pdf



Figure 8.3.3-2: RRM resources optimization procedure

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

**Verizon infringes the '305 patent.**

195.    Verizon infringes many claims of the '305 patent including at least claims 1, 2, 4, 7, 8, 9, 11, 13, 15, and 18 by using and providing Verizon's 3GPP Management System featuring logical management functions (MnFs) in the control plane, some of which represent corresponding data-plane objects (e.g., RAN domain MnF and core network MnF). These MnFs chain together to create network slices that provide end-to-end service guarantees.

## 4.5    Management Function (MnF) concept

A Management Function (MnF) is a logical entity playing the roles of MnS consumer and/or MnS producer.

A Management Service produced by MnF may have multiple consumers. The MnF may consume multiple Management Services from one or multiple Management Service producers. An example of a MnF playing both roles (Management Service producer and consumer) illustrated in the figure 4.5.1 below.

Management Function can be deployed as a separate entity or embedded in Network Function to provide MnS(s). Following figure 4.5.2 shows an example (on the left) which MnF deployed as a separate entity to provide MnS(s) and another example (on the right) which MnF is embedded in Network Function to provide MnS(s):





**Figure A.1.1: Example management layers in layered management model**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/18.01.00_60/ts_128533v180100p.pdf

196.    These MnFs also chain together to create network slices that satisfy end-to-end Service Level Specifications (SLSs).

6.7      Priority, QoS, and policy control

## 6.7.2    Requirements

The 5G system shall allow flexible mechanisms to establish and enforce priority policies among the different services (e.g. MPS, Emergency, medical, Public Safety) and users.

NOTE 1:  Priority between different services is subject to regional or national regulatory and operator policies.

The 5G system shall be able to provide the required QoS (e.g. reliability, end-to-end latency, and bandwidth) for a service and support prioritization of resources when necessary for that service.

The 5G system shall enable the network operator to define and statically configure a maximum resource assignment for a specific service that can be adjusted based on the network state (e.g. during congestion, disaster, emergency and DDoS events) subject to regional or national regulatory and operator policies.

The 5G system shall be able to support E2E (e.g. UE to UE) QoS for a service.

NOTE 2:  E2E QoS needs to consider QoS in the access networks, backhaul, core network, and network to network interconnect.

https://www.etsi.org/deliver/etsi_ts/122200_122299/122261/17.11.00_60/ts_122261v171100p.pdf

## 4.4    Managed network slice concepts

### 4.4.1    General

From a management point of view a network slice is complete in the sense that it includes all the network function instances, with their supporting resources, to provide service (e.g. to support a certain set of communication services, provide PNI-NPNs, etc. in NSaaS model) or operational efficiencies purpose (e.g. to optimize operator internal O&M procedures in network slice as NOP internals model). In other words, the network slice is complete if it completely satisfies the associated SLS.

The following concepts are related to network slicing management:

a.  Services which are supported by network slices (services whose service level requirements are satisfied by the SLS associated with the network slices).

b.   Network slice subnet instances and networks composed of PNF, VNF or both and offered as network slices.

c.  Network function (PNFs, VNFs) grouped into network slice subnets.

d.  Resources which support the network (e.g. virtualized resource, non-virtualized resource)

The 3GPP management system maintains the network topology and the related QOS requirements.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

197.    Verizon's 3GPP Management System orchestrates logical management functions (MnFs) (i.e., as *an End-to-End orchestrator*) in the control plane. The 3GPP Management System chains MFs together to create network slices that provide end-to-end service guarantees.

### 4.3.4    Operation

The Operation phase includes the activation, supervision, performance reporting (e.g. for KPI monitoring), resource capacity planning, modification, and de-activation of an NetworkSlice instance.

Activation makes the NetworkSlice instance ready to support communication services.

Resource capacity planning includes any actions that calculates resource usage based on an NetworkSlice instance provisioning, and performance monitoring and generates modification polices as a result of the calculation.

REQ-3GPPMS -CON-29 The 3GPP management system shall have the capability to perform network slice related operations (e.g., performance monitoring) considering requirements for each communication service when the network slice is used to support multiple communication services.

### 4.6.2    Service profile

Depending on industry requirements and operator's requirements, different service profiles may be used to represent SLS associated with network slices.

The following are examples for service profiles:

- A service profile is used to capture a set of requirements for the new network slice such as (eMBB, MIoT, URLLC).

- A service profile is used to capture a set of specific industry requirements for creation of network slice such as V2X, smart grid, Remote Healthcare.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/17.02.00_60/ts_128530v170200p.pdf

### 6.3    Management data analytics for 5G networks

The 5G networks have capability to support a variety of communication services, such as IoT and eMBB. The increasing flexibility of the networks to support services with diverse requirements may present operational and management challenges. 5G networks management system can therefore benefit from management data analytics for improving networks performance and efficiency to accommodate and support the diversity of services and requirements. The management data analytics utilize the collection of network data (including e.g. service, slicing and/or network functions related data) to perform analytics in order to assist and complement management services for an optimum network performance and service assurance.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/18.01.00_60/ts_128530v180100p.pdf



**Figure A.8.1: An example of deployment scenario for management of a mobile network including network slicing**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

198.    Verizon's 3GPP management system and associated MnFs (i.e., the *QoS chaining system*) are defined as logical entities and can run on any computing infrastructure. Verizon's management system runs on cloud infrastructure. For example, ETSI has developed an archetypal management system, called Open Source MANO, which runs on Kubernetes (i.e., a *virtual infrastructure* that *manages Internet delivery services via the plurality of VNFs and the E2E orchestrator*).



https://www.etsi.org/newsroom/press-releases/2479-etsi-open-source-mano-announces-release-seventeen-extending-its-capabilities-for-cloud-native-orchestration

In the case of OSM, there are two types of *NaaS service objects* that OSM is able to provide on demand to support the NaaS capability: the **Network Service (NS)** and the **Network Slice Instance (NSI)**, being the latter a composition of several Network Services that can be treated as a single entity (particularities of both types of *NaaS service objects* will be described in the next sections).

OSM, as *manager function* of a *service platform*, consumes services from other *service platforms* and controls a number of *managed functions* in order to create its own composite higher-level *service objects*. Thus, OSM consumes services provided by the platform(s) in charge of the Virtual infrastructure (to obtain VMs, etc.) and the platform(s) in charge of the SW-Defined Network (to obtain all the required kinds of inter-DC connections) and, once assembled, configures and monitors the constituent network functions (VNFs, PNFs, HNFs) in order to control the LCM of the entire NS/NSI to be offered on demand.

https://osm.etsi.org/docs/user-guide/latest/02-osm-architecture-and-functions.html

199.    Verizon's 3GPP management system and corresponding management functions operate in the control plane. Each network function is monitored and controlled by a network function management function (NFMF) and a managed object instance (MOI).



Figure A.1.1: Example management layers in layered management model

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/18.02.00_60/ts_128533v180200p.pdf



**Figure A.4.1 The deployment scenario for network slice subnet management with interface to NFV-MANO**

https://www.etsi.org/deliver/etsi_ts/128500_128599/128533/16.06.00_60/ts_128533v160600p.pdf

200.    The 3GPP management system and corresponding management functions operate in the control plane. Each network function is monitored and controlled by a network function management function (NFMF) and a managed object instance (MOI) (i.e., the VNF *monitors and controls each of the corresponding data-plane objects*). Below is shown the MOIs representing the various functions of a gNB.

> **Managed Object (MO)**: A MO is an instance of a Managed Object Class (MOC) representing the management aspects of a network resource. Its representation is a technology specific software object. It is sometimes called MO instance (MOI). The MOC is a class of such technology specific software objects. An MOC is the same as an IOC except that the former is defined in technology specific terms and the latter is defined in technology agnostic terms. MOCs are used/defined in SS level specifications. IOCs are used/defined in IS level specifications.

### 4.3.3    ManagedElement

#### 4.3.3.1    Definition

This IOC represents telecommunications equipment or TMN entities within the telecommunications network providing support and/or service to the subscriber.

A `ManagedElement` IOC is used to represent a Network Element defined in TS 32.101[1] including virtualization or non-virtualization scenario. `ManagementElement` instance is used for communicating with a manager (directly or indirectly) over one or more management interfaces for the purpose of being monitored and/or controlled. `ManagedElement` may or may not additionally perform element management functionality. A `ManagedElement` contains equipment that may or may not be geographically distributed.

The relation of `ManagedElement` IOC and `ManagedFunction` IOC can be described as following:

- A `ManagedElement` instance may have 1..1 containment relationship to a `ManagedFunction` instance. In this case, the `ManagedElement` IOC may be used to represent a NE with single `ManagedFunction` functionality. For example, a `ManagedElement` is used to represent the 3GPP defined RNC node.

- A `ManagedElement` instances may have 1..N containment relationship to multiple `ManagedFunction` IOC instances. In this case, the `ManagedElement` IOC may be used to represent a NE with combined `ManagedFunction` functionality (as indicated by the `managedElementType` attribute and the contained instances of different `ManagedFunction` IOCs). For example, a `ManagedElement` is used to represent the combined functionality of 3GPP defined gNBCUCPFunction, gNBCUUPFunction and gNBDUFunction.

https://www.etsi.org/deliver/etsi_ts/128600_128699/128622/16.07.01_60/ts_128622v160701p.pdf

201.    Management functions also produce or consume provisioning MnS(s) to control network elements. This is accomplished using the modifyMOIAttributes operation.



Figure 7.11-1: Network Function Instance Modify procedure

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/18.05.00_60/ts_128531v180500p.pdf

202.    Verizon's 3GPP Management System collects diagnostic data (i.e., *provide a function of diagnostics for each of the corresponding data-plane objects*), measuring the performance of each network slice and its constituent parts.

| Performance measurements | Description |
|---|---|
| Mean DL PRB used for data traffic | Provides the mean number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.5 in TS 28.552 [5]). |
| Peak DL PRB used for data traffic | Provides the peak number of PRBs used in downlink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.9 in TS 28.552 [5]). |
| Mean UL PRB used for data traffic | Provides the mean number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.7 in TS 28.552 [5]). |
| Peak UL PRB used for data traffic | Provides the peak number of PRBs used in uplink for data traffic in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.2.10 in TS 28.552 [5]).. |
| Average DL UE throughput in gNB | Provides the average UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.1 in TS 28.552 [5]). |
| Distribution of DL UE throughput in gNB | Provides the distribution of the UE throughput in downlink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.2 in TS 28.552 [5]). |
| Average UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.3 in TS 28.552 [5]). |
| Distribution of UL UE throughput in gNB | Provides the average UE throughput in uplink in the NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.3.4 in TS 28.552 [5]). |
| Mean number of Active UEs in the DL per cell | Provides the mean number of active UEs in downlink in an NRCellDU, with subcounters per sNSSAI (see clause 5.1.1.23.1 in TS 28.552 [5]). |

| | |
|---|---|
| 5.2 | Performance measurements for AMF |
| 5.3 | Performance measurements for SMF |
| 5.4 | Performance measurements for UPF |
| 5.5 | Performance measurements for PCF |

https://www.etsi.org/deliver/etsi_ts/128300_128399/128313/17.04.00_60/ts_128313v170400p.pdf

203.    If a Network Slice is not meeting specified performance requirements, the Verizon 3GPP management system creates, modifies, or reconstitutes a network slice in real time.

### 5.1.2    Network slicing management

**REQ-3GPPMS-CON-01** The 3GPP management system shall have the capability to create a new or use an existing NetworkSlice instance according to the communication service requirements.

**REQ-3GPPMS-CON-02** The 3GPP management system shall have the capability to translate the communication service requirements to network slice related requirements.

**REQ-3GPPMS-CON-03** The 3GPP management system shall have the capability to create a new or use an existing NetworkSlice instance according to the network slice related requirements

NOTE:    The network slice related requirements include requirements such as: area traffic capacity, charging, coverage area, degree of isolation, end-to-end latency, mobility, overall user density, priority, service availability, service reliability, UE speed.

https://www.etsi.org/deliver/etsi_ts/128500_128599/128530/16.06.00_60/ts_128530v160600p.pdf

204.    Management functions are configured with the ability to communicate directly, using one of three paradigms: request-response, subscribe notify, and connect-streaming.

### 5.1.2    Interactions between management service producer and management service consumer

The interactions between the management service producer and management service consumer follows one of the three following paradigms:



**Figure 5.1.2.1: Request-response communication paradigm**



Figure 5.1.2.2: Subscribe-notify communication paradigm



Figure 5.1.2.3: Connect-streaming communication paradigm

205.    The NFMFs are configured to communicate directly with, e.g., the network slice subnet management function, which will send commands to modify its constituent NFs.

## 7.7        Procedure of Network Slice Subnet Instance Modification

The Figure 7.7-1 illustrates the procedure of modifying an existing NSSI.



Figure 7.7-1: Network Slice Subnet Instance Modification Request procedure

https://www.etsi.org/deliver/etsi_ts/128500_128599/128531/16.07.00_60/ts_128531v160700p.pdf.

206.    Management functions are configured to communicate with each other through the Verizon management system by registering with the management system so that they can be found by other MFs or registering the management data they produce so that the data can be consumed without their involvement.

## 5.1    Overview

To enable communication between MnS consumers and MnS producers, MnS consumers need a mechanism to discover MnS producers that are available in the 3GPP management system, and their management capabilities.

To this end, MnS producers need to register themselves with their management capabilities in the 3GPP management system. The data describing a MnS producer and their capabilities is called MnS information or MnS profile. The complete profile or parts thereof is registered in the 3GPP management system. In case registered MnS information changes, the 3GPP management system needs to be updated as well and MnS consumers of the modified MnS producer should be informed.

## 6.5.1    Description

Discovery of management data mechanism allows MnS consumers to discover what management data can be produced by the 3GPP management system without direct involvement of those MnS services producing the data, which can be time and resource consuming process.

For this mechanism to work MnS producers as entities producing data, need to register what data they can produce by adding a corresponding record in the 3GPP management system.

NOTE: The term "management data produced by 3GPP management system" relates to

-    5G performance measurements as defined by TS 28.552 [4]

-    5G end to end key performance indicators as defined by TS 28.554 [5], and

https://www.etsi.org/deliver/etsi_ts/128500_128599/128537/17.03.00_60/ts_128537v170300p.pdf

207.    Management functions are configured to communicate through a shared database. For example, the ADRF can store and retrieve collected data and analytics.

### 4.2.1    Analytics Data Repository Function

As depicted in Figure 4.2.1-1, the 5G System architecture allows ADRF to store and retrieve the collected data and analytics. The following options are supported:

-   ADRF exposes the Nadrf service for storage and retrieval of data by other 5GC NFs (e.g. NWDAF) which access the data using Nadrf services.

-   Based on the NF request or configuration on the DCCF, the DCCF may determine the ADRF and interact directly or indirectly with the ADRF to request or store data. The interaction can be:

    -   Direct: the DCCF requests to store data in the ADRF via an Nadrf service, or via an Ndccf_DataManagement_Notify (e.g. when ADRF requested data collection notification via DCCF). In addition, the DCCF retrieves data from the ADRF via an Nadrf service.

    -   Indirect: the DCCF requests that the Messaging Framework to store data in the ADRF i.e. via an Nadrf service or via an Nmfaf_3daDataManagement_Configure. The Messaging Framework may contain one or more Adaptors that translate between 3GPP defined protocols.



**Figure 4.2.1-1: Data storage architecture for Analytics and Collected Data**

https://www.etsi.org/deliver/etsi_ts/123200_123299/123288/18.05.00_60/ts_123288v180500p.pdf

208.    Management functions are configured to communicate through a shared database also via VNFs connected to the UDR that can store and retrieve collected data.

# 7.2.10    UDR Services

The following NF services are specified for UDR:

**Table 7.2.10-1: NF Services provided by UDR**

| Service Name | Description | Reference in TS 23.502 [3] |
|---|---|---|
| Nudr_DM | Allows NF consumers to retrieve, create, update, subscribe for change notifications, unsubscribe for change notifications and delete data stored in the UDR, based on the set of data applicable to the consumer. This service may also be used to manage operator specific data. | 5.2.12.2 |
| Nudr_GroupIDmap | Allows NF consumers to retrieve a NF group ID corresponding to a subscriber identifier. | 5.2.12.9 |

NOTE 5:  There can be multiple UDRs deployed in the network, each of which can accommodate different data sets or subsets, (e.g. subscription data, subscription policy data, data for exposure, application data) and/or serve different sets of NFs. Deployments where a UDR serves a single NF and stores its data, and, thus, can be integrated with this NF, can be possible.

NOTE 6: The internal structure of the UDR in figure 4.2.5-2 is shown for information only.

The Nudr interface is defined for the network functions (i.e. NF Service Consumers), such as UDM, PCF and NEF, to access a particular set of the data stored and to read, update (including add, modify), delete, and subscribe to notification of relevant data changes in the UDR.

Each NF Service Consumer accessing the UDR, via Nudr, shall be able to add, modify, update or delete only the data it is authorised to change. This authorisation shall be performed by the UDR on a per data set and NF service consumer basis and potentially on a per UE, subscription granularity.

## 5.20b.3  Support QoS for a group

The procedure as defined in clause 4.15.6.2 of TS 23.502 [3] is applicable for provisioning of default QoS for a DNN and S-NSSAI for a group of UEs with the following clarifications and enhancements:

- The AF request contains the Default QoS for the group, and the UDM stores such QoS in the UDR and uses such QoS to set 5GS Subscribed QoS profile in Session Management Subscription data for each UE within the group.

   NOTE:    When a UE belongs to multiple groups simultaneously, and AF(s) provision different Default QoS for the same DNN and S-NSSAI but different groups, UDM selects a QoS profile among the groups the UE belongs to for a DNN and S-NSSAI to set the 5GS subscribed QoS profile. How the UDM selects a QoS profile is based on implementation and configuration. The UDM can e.g. select a QoS profile with a higher 5QI Priority Level or higher ARP priority level.

Mechanisms as defined in clause 5.7.2.7 are used to enforce the 5GS Subscribed QoS profile for a DNN and S-NSSAI for each UE within a group.



https://www.etsi.org/deliver/etsi_ts/123500_123599/123501/18.07.00_60/ts_123501v180700p.pdf

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 10,924,359)

209.    Plaintiff incorporates paragraphs 1 through 208 herein by reference.

210.    Epic Lane Networks is the assignee of the '359 patent and owns all substantial rights in the '359 patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

211.    The '359 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '359 patent issued from U.S. Patent Application No. 16/040,958.

212.    Verizon has and continues to directly and/or indirectly infringe the asserted claims of the '359 patent literally or under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

213.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities

of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

214.    Verizon directly infringes the '359 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '359 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '359 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

215.    Furthermore, Defendants directly infringe the '359 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by

designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '359 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

216.     Each claim of the '359 patent, including claims 1, 3-7, 9,10, and 12-17, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 1, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 1 is directed to new and useful improvements in communications network technology. Specifically, claim 1 contains at least the technological solution of providing a "management entity" that "creates a plurality of virtualize access aggregation devices" which are "related to [a] plurality of physical access aggregation devices." These virtual access aggregation

devices improve the functioning of communications networks by "performing functions that support associated logical aggregation networks with network characteristics defined by service definition rules." These claimed limitations of a "network management apparatus" constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

217.    Defendants infringe the '359 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

218.    Those Accused Products include "[a] network management apparatus" comprising the limitations of claim 1. The technology discussion and exemplary infringements described above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include a plurality of physical access aggregation interfaces coupled to a plurality of physical access aggregation devices, the plurality of physical access aggregation devices provides one or more broadband communication services to a plurality of remote broadband terminals; and a management entity coupled to the plurality of physical access aggregation interfaces, the management entity creates a plurality of virtual access aggregation devices related to the plurality physical access aggregation devices, the plurality of virtual access aggregation devices performs functions that support associated logical aggregation networks with network characteristics defined by service definition rules.

219.    At a minimum, Defendants have known of the '359 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '359 patent, since at least their receipt of

correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '359 patent. The parties continued to correspond from March 2025 until at least August 2025. This sequence of correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

220.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '359 patent to directly infringe one or more claims of the '359 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '359 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See*, *e.g.*, *Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-

slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g.*, *Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

221.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '359 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

222.    On information and belief, despite having knowledge of the '359 patent and knowledge that it is directly infringing one or more claims of the '359 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '359 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

223.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II
## (INFRINGEMENT OF U.S. PATENT NO. 11,843,520)

224.    Plaintiff incorporates paragraphs 1 through 223 herein by reference.

225.    Epic Lane Networks is the assignee of the '520 patent and owns all substantial rights in the '520 patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

226.    The '520 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '520 patent issued from U.S. Patent Application No. 17/175,951.

227.    Defendants have and continue to directly and/or indirectly infringe one or more claims of the '520 patent literally or under the doctrine of equivalents in this District and elsewhere in Texas and the United States.

228.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

229.    Verizon directly infringes the '520 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '520 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '520 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad

but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

230.    Furthermore, Defendants directly infringe the '520 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '520 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

231.    Each claim of the '520 patent, including claims 17 and 20, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 17, as a

whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 17 is directed to new and useful improvements in communications network technology. Specifically, claim 17 contains at least the technological solution of providing an "access aggregation device" that comprises "one or more physical ports to communicate with at least a first network device" and an "access aggregation virtualization device comprising one or more logical ports and at least one of a control interface or a communication interface." The claimed access aggregation virtualization device "establishes one or more links to the access aggregation device, which is remotely located from the access aggregation virtualization device." This access aggregation virtualization device improves the functioning of communications networks by "associat[ing] the one or more logical ports with the one or more physical ports to enable a communication between the first network device and a second network device." These claimed limitations of an "access aggregation virtualization system" constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

232.    Defendants infringe the '520 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

233.    Those Accused Products include "[an] access aggregation virtualization system" comprising the limitations of at least claims 17 and 20. The technological discussion and exemplary infringements described above and the exemplary Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include an access aggregation device comprising one or more physical ports (literally or insubstantially

different) to communicate with at least a first network device; and an access aggregation virtualization device comprising one or more logical ports and at least one of a control interface or a communication interface, the access aggregation virtualization device establishes one or more links to the access aggregation device, which is remotely located from the access aggregation virtualization device, the aggregation virtualization device and associates the one or more logical ports with the one or more physical ports to enable a communication between the first network device and a second network device.

234.    At a minimum, Defendants have known of the '520 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '520 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '520 patent. The parties continued to correspond from March 2025 until at least August 2025. This sequence of correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

235.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '520 patent to directly infringe one or more claims of the '520 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at

least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '520 patent. Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See*, *e.g.*, *Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the

accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g.*, *Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

236.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '520 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

237.    On information and belief, despite having knowledge of the '520 patent and knowledge that it is directly infringing one or more claims of the '520 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '520 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

238.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III

## (INFRINGEMENT OF U.S. PATENT NO. 10,050,846)

239.    Plaintiff incorporates paragraphs 1 through 238 herein by reference.

240.    Epic Lane Networks is the assignee of the '846 patent and owns all substantial rights in the '846 patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

241.    The '846 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '846 patent issued from U.S. Patent Application No. 15/188,959.

242.    Defendants have and continue to directly and/or indirectly infringe one or more claims of the '846 patent literally or under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

243.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

244.    Verizon directly infringes the '846 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '846 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those

products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '846 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

245.    Furthermore, Defendants directly infringe the '846 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '846 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents,

distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

246.    Each claim of the '846 patent, including claims 1, 2, 3, 4, 6, 8, 13, and 19, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 1, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 1 is directed to new and useful improvements in communications network technology. Specifically, claim 1 contains at least the technological solution of providing "virtual access aggregation devices" and a "centralized management system communicatively interfaced to multiple access aggregation devices" that include "a plurality of physical ports to provide one or more broadband communication services to a plurality of remote broadband terminals via the plurality of physical ports." The centralized management system "represent[s] the plurality of physical ports at the multiple access aggregation devices communicably interfaced therewith to the one or more virtual access aggregation devices." The physical ports "are to be allocated to the one or more virtual access aggregation devices and to be linked to corresponding logical ports within the one or more virtual access aggregation devices." The centralized management system improves the functioning of communications networks by "receiv[ing] a request via a control interface to manage a logical port within a first virtual access aggregation device" and "send[ing] a notification via a management interface that a management selection specified by the request complies with operational constraints" and "manag[ing] the logical port in accordance with the request." These

claimed limitations of the "apparatus" of claim 1 constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

247.     Defendants infringe at least claim 1 of the '846 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

248.     Those Accused Products include "[an] apparatus" comprising the limitations of claim 1. The technology discussion and exemplary infringements described above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is met. For example, the Accused Products include a one or more virtual access aggregation devices; and a centralized management system communicatively interfaced to multiple access aggregation devices, at least one of which includes a plurality of physical ports (literally or insubstantially different) to provide one or more broadband communication services to a plurality of remote broadband terminals via the plurality of physical ports; wherein the centralized management system is to: represent the plurality of physical ports at the multiple access aggregation devices communicably interfaced therewith to the one or more virtual access aggregation devices, wherein the plurality of physical ports are to be allocated to the one or more virtual access aggregation devices and to be linked to corresponding logical ports within the one or more virtual access aggregation devices; receive a request via a control interface to manage a logical port within a first virtual access aggregation device of the one or more virtual access aggregation devices, and send a notification via a management interface that a management selection specified by the request complies with operational constraints, and to manage the logical port in accordance with the request.

249.    Defendants have known of the '846 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '846 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '846 patent The parties continued to correspond from March 2025 until at least August 2025. This sequence of correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

250.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '846 patent to directly infringe one or more claims of the '846 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '846 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or

maintaining established distribution channels for the Accused Products into and within the United States. *See, e.g., Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g., Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

251.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '846 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

252.    Despite having knowledge of the '846 patent and knowledge that it is directly infringing one or more claims of the '846 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '846 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

253.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 11,695,588)

254.    Plaintiff incorporates paragraphs 1 through 253 herein by reference.

255.    Epic Lane Networks is the assignee of the '588 patent and owns all substantial rights in the '588 patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

256.    The '588 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '588 patent issued from U.S. Patent Application No. 16/991,002.

257.    Defendants have and continue to directly and/or indirectly infringe one or more claims of the '588 patent literally and under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

258.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

259.    Verizon directly infringes the '588 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '588 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby

directly infringing the '588 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

260.    Furthermore, Defendants directly infringe the '588 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '588 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing

activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

261.    Each claim of the '588 patent, including claims 1, 4, 10, 17, 18, and 19, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 18, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 18 is directed to new and useful improvements in communications network technology. Specifically, claim 18 contains at least the technological solution of providing "a virtualized implementation of at least one function of broadband access network elements." The virtualized implementation of the at least one function of the broadband access network elements is updated "in response to receiving operational data for broadband access from at least one of the broadband access network elements through a functions abstraction layer." The functions abstraction layer improves the functioning of communications networks by "generating control parameters to affect an operation of at least one of the broadband access network elements," where the control parameters are "at least partially based on the operation data" and "communicating the control parameters to at least one of the broadband access network elements through the functions abstraction layer." These claimed limitations of a "computer-implemented method for processing functions on a virtualized computing structure" constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

262.    Defendants infringe the '588 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

263.    The Accused Products process functions on a virtualized computing structure, comprising the steps of claim 18. The technology discussion and exemplary infringements described above and the example Accused Products provide context for Plaintiff's allegations that each of those steps is practiced by Defendants. For example, the Accused Products include providing a virtualized implementation of at least one function of broadband access network elements; in response to receiving operational data for broadband access from at least one of the broadband access network elements through a functions abstraction layer, updating the virtualized implementation of the at least one function of the broadband access network elements; generating control parameters to affect an operation of at least one of the broadband access network elements, the control parameters being at least partially based on the operation data; and communicating the control parameters to at least one of the broadband access network elements through the functions abstraction layer.

264.    Defendants have known of the '588 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '588 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '588 patent The parties continued to correspond from March 2025 until at least August 2025. This sequence of correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

265.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other

third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '588 patent to directly infringe one or more claims of the '588 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '588 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See, e.g., Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including,

for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g.*, *Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

266.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '588 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

267.    Despite having knowledge of the '588 patent and knowledge that it is directly infringing one or more claims of the '588 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '588 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

268.     Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V
## (INFRINGEMENT OF U.S. PATENT NO. 12,335,092)

269.     Plaintiff incorporates paragraphs 1 through 268 herein by reference.

270.     Plaintiff is the assignee of the '092 patent and owns all substantial rights in the '092 patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

271.     The '092 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '092 patent issued from U.S. Patent Application No. 17/408,491.

272.     Defendants have and continue to directly and/or indirectly infringe one or more claims of the '092 patent literally and under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

273.     Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

274.     Verizon directly infringes the '092 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or

products containing the same that incorporate the fundamental technologies covered by the '092 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '092 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

275. Furthermore, Defendants directly infringe the '092 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '092 patent under 35

U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

276.    Each claim of the '092 patent, including claims 1, 3, 4, 10, 11, 12, 13, 16, and 17, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 1, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 1 is directed to new and useful improvements in communications network technology. Specifically, claim 1 contains at least the technological solution of providing a "first virtualized network function," "second virtualized network function," and "third virtualized network function" each coupled to receive a first, second, and third portion, respectively, of "data related to a cellular network having cellular terminals." The first virtualized network function "generates a first instruction related to traffic allocation within the cellular network," the second virtualized network function "generates a second instruction related to bandwidth allocation within the cellular network," and the third virtualized network function "generates a third instruction related to quality of service assignment to a first cellular terminal within the cellular network." A

"control plane interface coupled to a physical cellular access node" receives the data related to the cellular network. This control plane interface improves the functioning of communications networks by "transmit[ing] the first, second and third instructions" generated by each virtualized network function "to the physical cellular access node." These claimed limitations of a "virtualized cellular access node" constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

277.    Defendants infringe the '092 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

278.    The Accused Products include "[a] virtualized cellular access node" comprising the limitations of claim 1. The technology discussion and exemplary infringements described above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is included in those Accused Products. For example, the Accused Products include a control plane interface coupled to a physical cellular access node, the control plane interface receives data related to a cellular network having cellular terminals; a first virtualized network function coupled to receive at least a first portion of the data, the first virtualized network function analyzes the at least first portion of data and generates a first instruction related to traffic allocation within the cellular network; a second virtualized network function coupled to receive at least a second portion of the data, the second virtualized network function analyzes the at least second portion of the data and generates a second instruction related to bandwidth allocation within the cellular network; and a third virtualized network function coupled to receive at least a third portion

of the data, the third virtualized network function analyzes at least a third portion of the data and generates a third instruction related to quality of service assignment to a first cellular terminal within the cellular network; wherein the control plane interface transmits the first, second and third instructions to the physical cellular access node.

279.    Defendants have known of the '092 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '092 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications on or about June 30, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '092 patent. The parties continued to correspond until at least August 2025. This correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

280.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '092 patent to directly infringe one or more claims of the '092 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '092 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps

to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See*, *e.g.*, *Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g., Customer Training*, VERIZON, *available at*

https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

281.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '092 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

282.    On information and belief, despite having knowledge of the '092 patent and knowledge that it is directly infringing one or more claims of the '092 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '092 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

283.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI
### (INFRINGEMENT OF U.S. PATENT NO. 11,924,059)

284.    Plaintiff incorporates paragraphs 1 through 283 herein by reference.

285.    Plaintiff is the assignee of the '059 patent, entitled "Systems and methods for chaining control-plane virtual functions for ensuring end-to-end quality of service (QOS) of internet services" with ownership of all substantial rights in the '059 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

286.    The '059 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '059 patent issued from U.S. Patent Application No. 17/391,007.

287.    Defendants have and continue to directly and/or indirectly infringe one or more claims of the '059 patent literally or under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

288.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

289.    Verizon directly infringes the '059 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '059 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers,

channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '059 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

290.    Furthermore, Defendants directly infringe the '059 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '059 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the

same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

291.    Each claim of the '059 patent, including claims 1, 5, 6, 7, 8, 9, 11, and 16, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 1, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 1 is directed to new and useful improvements in communications network technology. Specifically, claim 1 contains at least the technological solution of providing a "a Virtual Network Function (VNF) that represents a corresponding data-plane object and operates within a control plane" and "an orchestrator operable in the control plane." The VNF "supports quality of service (QoS) chaining to coordinate an interchange of QoS diagnostic data across a plurality of chained VNFs that correspond to data-plane objects." The orchestrator improves the functioning of communications networks by "assign[ing] classes of service (CoS) and resources across the VNFs to increase a service level and a bandwidth in real-time" "based at least in part on" QoS diagnostics received from the VNF. These claimed limitations of a "system" of claim 1 constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

292.    Defendants infringe the '059 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

293.    The Accused Products include "[a] virtualized cellular access node" comprising the limitations of claim 1. The technology discussion and exemplary infringements described above and the example Accused Products provide context for Plaintiff's allegations that each of those limitations is included in those Accused Products. For example, the Accused Products include a control plane interface coupled to a physical cellular access node, the control plane interface receives data related to a cellular network having cellular terminals; a first virtualized network function coupled to receive at least a first portion of the data, the first virtualized network function analyzes the at least first portion of data and generates a first instruction related to traffic allocation within the cellular network; a second virtualized network function coupled to receive at least a second portion of the data, the second virtualized network function analyzes the at least second portion of the data and generates a second instruction related to bandwidth allocation within the cellular network; and a third virtualized network function coupled to receive at least a third portion of the data, the third virtualized network function analyzes at least a third portion of the data and generates a third instruction related to quality of service assignment to a first cellular terminal within the cellular network; wherein the control plane interface transmits the first, second and third instructions to the physical cellular access node.

294.    At a minimum, Defendants have known of the '059 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '059 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '059 patent The parties continued to correspond from March 2025 until at least August 2025. This sequence of

correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

295.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '059 patent to directly infringe one or more claims of the '059 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '059 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See*, *e.g.*, *Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for

tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g., Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

296.    Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '059 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

297.    Despite having knowledge of the '059 patent and knowledge that it is directly infringing one or more claims of the '059 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants'

infringing activities relative to the '059 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

298.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII
## (INFRINGEMENT OF U.S. PATENT NO. 11,082,305)

299.    Plaintiff incorporates paragraphs 1 through 298 herein by reference.

300.    Epic Lane Networks is the assignee of the '305 patent and owns all substantial rights in the '305 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

301.    The '305 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '305 patent issued from U.S. Patent Application No. 16/024,420.

302.    Defendants have and continue to directly and/or indirectly infringe one or more claims of the '305 patent literally and under the doctrine of equivalents in this district and elsewhere in Texas and the United States.

303.    Defendants design, develop, manufacture, import, distribute, offer to sell, sells and use the accused virtualization and network slicing products and services, including via the activities

of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers and via the activities of Verizon's members, segments, companies and/or brands.

304.    Verizon directly infringes the '305 patent via 35 U.S.C. § 271(a) by manufacturing (including via contract manufacturers and vendor-provided equipment), offering for sale, selling, using (including via testing), and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the '305 patent to, for example, its importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users. Furthermore, on information and belief, Verizon designs the Accused Products for U.S. consumers, makes and sells the Accused Products outside of the United States, delivers those products to related entities, subsidiaries, importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, consumers and other users in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale and use in the United States, thereby directly infringing the '305 patent. *See, e.g., Lake Cherokee Hard Drive Techs., LLC. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013) (denying summary judgment and allowing presentation to jury as to "whether accused products manufactured and delivered abroad but imported into the United States market by downstream customers … constitute an infringing sale under § 271(a)").

305.    Furthermore, Defendants directly infringe the '305 patent through their direct involvement in the activities of Verizon's alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers, including by

designing the Accused Products for U.S. consumers and selling and offering for sale the Accused Products directly to its related entities and importing the Accused Products into the United States for its related entities. On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, members, segments, companies, brands, and/or consumers conduct activities that constitute direct infringement of the '305 patent under 35 U.S.C. § 271(a) by importing, offering for sale, selling, and/or using (including via testing) those Accused Products in the U.S. on behalf of and for the benefit of Verizon. Defendants are vicariously liable for the infringing conduct of their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, and/or brands (under both the alter ego and agency theories). On information and belief, Defendants and their alter egos, intermediaries, agents, distributors, importers, subsidiaries, members, segments, companies, brands are essentially the same company (i.e., "Verizon" or "Verizon Wireless"), operating in the U.S. via at least Verizon's brands, segments, mergers, or acquisitions. Moreover, Verizon, as the parent company, along with its related entities, has the right and ability to control and/or delegate the control of the infringing activities of those subsidiary entities such that Verizon receives a direct financial benefit from that infringement.

306.    Each claim of the '305 patent, including claims 1, 2, 4, 7, 8, 9, 11, 13, 15, and 18, is directed to patentable subject matter under 35 U.S.C. § 101. For example, the claimed subject matter of claim 1, as a whole, is not directed to an abstract idea, law of nature, or any natural phenomena. Instead, claim 1 is directed to new and useful improvements in communications network technology. Specifically, claim 1 contains at least the technological solution of providing "a plurality of Virtual Network Functions (VNFs) that are abstractions representing corresponding data-plane objects" and "an End-to-End (E2E) orchestrator, positioned in the control-plane." The

VNFs "operate on quality of service (QoS) data and configurations in a control-plane," and "by operating on quality of service (QoS) data and configurations in a control-plane, QoS chaining operates at a higher abstraction layer than network service chaining." The E2E orchestrator "chains the plurality of VNFs to provide end-to-end QoS across the corresponding data-plane objects including data-plane service elements and/or network elements." The E2E orchestrator improves the functioning of communications networks by providing a "QoS chaining system [that] runs on a virtual infrastructure and manages Internet delivery services via the plurality of VNFs and the E2E orchestrator" and "provides real-time services operations," including by providing "data-plane service elements and/or network elements [that] have a corresponding VNF in the control-plane that monitors and controls each of the corresponding data-plane objects," "corresponding VNFs [that] provide a function of diagnostics for each of the corresponding data-plane objects," and "VNFs [that] are configured to be chained, to communicate directly with each other, to communicate directly with the E2E orchestrator, to communicate with each other through the E2E orchestrator, and to communicate through a shared database." These claimed limitations of a "QoS chaining system" constitute a practical application that improves the functioning of communications networks themselves, and therefore are directed to patent-eligible subject matter under § 101.

307.    Defendants infringe the '305 patent via the Accused Products that provide virtual network products and services, including, but not limited, to Defendants' virtualization (also referred to as vRAN) and network slicing products, their components, software/firmware, services, processes, methods, and related accessories.

308.    The Accused Products include "[a] system" comprising the limitations of claim 1. The technology discussion and exemplary infringements described above and the example Accused

Products provide context for Plaintiff's allegations that each of those limitations is included in those Accused Products. For example, the Accused Products include a plurality of Virtual Network Functions (VNFs) that are abstractions representing corresponding data-plane objects, which operate on quality of service (QoS) data and configurations in a control-plane, wherein by operating on quality of service (QoS) data and configurations in a control-plane, QoS chaining operates at a higher abstraction layer than network service chaining and an End-to-End (E2E) orchestrator, positioned in the control-plane, that chains the plurality of VNFs to provide end-to-end QoS across the corresponding data-plane objects including data-plane service elements and/or network elements, wherein the QoS chaining system runs on a virtual infrastructure and manages Internet delivery services via the plurality of VNFs and the E2E orchestrator, wherein each of the data-plane service elements and/or network elements have a corresponding VNF in the control-plane that monitors and controls each of the corresponding data-plane objects, wherein each of the corresponding VNFs provide a function of diagnostics for each of the corresponding data-plane objects, wherein the QoS chaining system provides real-time services operations, wherein the plurality of VNFs are configured to be chained, to communicate directly with each other, to communicate directly with the E2E orchestrator, to communicate with each other through the E2E orchestrator, and to communicate through a shared database.

309.    At a minimum, Defendants have known of the '305 patent at least as early as the filing date of this Complaint. In addition, Defendants have known about their infringement of Epic Lane's patent portfolio, including infringement of the '305 patent, since at least their receipt of correspondence from Epic Lane to Verizon Communications dated March 21, 2025. Plaintiff Epic Lane also provided Verizon with claim charts detailing Verizon's infringement of the '305 patent The parties continued to correspond from March 2025 until at least August 2025. This sequence of

correspondence notifies Defendants that their products and services practice at least the virtual network technologies covered by the Epic Lane patent portfolio.

310.    Since at least the above-mentioned date when Defendants were on notice of its infringement, Defendants have each actively induced, under 35 U.S.C. § 271(b), importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers that import, distribute, purchase, offer for sale, sell, or use (including via testing) the Accused Products that include or are made using all of the limitations of one or more claims of the '305 patent to directly infringe one or more claims of the '305 patent by using (including via testing), offering for sale, selling, and/or importing the Accused Products. Since at least the date of notice provided above, Defendants have conducted infringing activities with knowledge, or with willful blindness of the fact that the induced acts constitute infringement of the '305 patent. On information and belief, Defendants intend to cause, and have taken affirmative steps to induce, infringement by importers, online stores, distribution partners, retailers, channel partners, systems integrators, service providers, other third-party resellers, distributors, and contract manufacturers, consumers, other users, and other related service providers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States. *See*, *e.g.*, *Verizon Frontline Network Slice*, VERIZON, https://www.verizon.com/business/solutions/public-sector/public-safety/5g-innovations/network-slice/ (last visited September 5, 2025) (advertising that "Network Slicing is a new technology that is available on 5G standalone networks. This technology enables Verizon to create and manage multiple virtual networks with the existing physical network infrastructure. A slice allows for

tailoring of specific network attributes to specific customer needs like latency, throughput and availability. This capability, designed for network traffic on Verizon's new cloud-native, containerized, virtualized standalone 5G core, will offer unprecedented levels of service agility, flexibility and automated scalability.") Moreover, Defendants manufacture, test, and certify the Accused Products in conformity with and to operate within U.S. laws and regulations, including, for example, the FCC, 3GPP, and ISO, specifically so that consumers may be induced to purchase and use the Accused Products. Also, Defendants provide, distribute, or make available instructions, manuals, training, and other technical assistance and support services for these products to customers, clients, and partners in Verizon's Consumer and Business Groups (including in its Enterprise and Public Sector, its Business Markets, and its Wholesale market); Verizon also tests and certifies the communications networking features in the accused virtualization and network slicing products and services for use and operation in the U.S. for and on behalf of its customers, clients, and partners in the United States. *See, e.g.*, *Customer Training*, VERIZON, *available at* https://customertraining.verizon.com/ (providing links where users and customers may access "[t]he Customer Learning Portal [which] provides Verizon customers with training and resources for products, systems and tools.") (last visited September 5, 2025).

311. Plaintiff has complied with all requirements of 35 U.S.C. § 287 relating to its assertion of infringement of the '305 patent by Defendants. Specifically, Plaintiff does not make any products subject to the marking requirement of 35 U.S.C. § 287, nor is it aware of any products that are or ever have been subject to that requirement.

312. Despite having knowledge of the '305 patent and knowledge that it is directly infringing one or more claims of the '305 patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants'

infringing activities relative to the '305 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

313.    Plaintiff Epic Lane has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are thus liable (including jointly and severally liable with their alter egos, intermediaries, agents, distributors, importers, subsidiaries) to Epic Lane in an amount that adequately compensates Epic Lane for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## NOTICE

314.    With the exception of the '092 patent, which issued June 17, 2025, Epic Lane provided actual notice of infringement of all asserted patents on March 21, 2025.

315.    Plaintiff provided actual notice of infringement of the '092 patent on June 30, 2025.

## NOTICE OF
## REQUIREMENT OF LITIGATION HOLD

316.    Defendants are hereby notified they are legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Defendants know, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

317.    As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored. These sources may also include any personal electronic, digital, and storage devices of any and all of Defendants' agents, resellers, distributors or employees if Verizon's electronically stored information resides there.

318.    Defendants are hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendants' claims and/or defenses. To avoid such a result, Defendants' preservation duties include, but are not limited to, the requirement that Defendants immediately notify their agents, distributors, and employees to halt and/or supervise the auto-delete functions of Defendants' electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## CONCLUSION

319.    Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

320.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

321.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

Plaintiff requests that the Court find in its favor and against each of the Verizon Defendants, and that the Court grant Plaintiff the following relief:

A.    A judgment that Defendants have infringed the Asserted Patents as alleged herein;

B.    A judgment for an accounting of damages sustained by Plaintiff as a result of the acts of infringement by Defendants;

C.    A judgment and order requiring Defendants to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

D.    A judgment and order finding this to be an exceptional case and requiring Defendants to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285;

E.    A judgment and order requiring Defendants to pay Plaintiff pre-judgment and

post-judgment interest on all damages, enhanced damages, and attorneys' fees and

costs awarded; and

F.    Such other and further relief as the Court deems just and equitable.

Dated: December 18, 2025

Respectfully submitted,

/s/ Terry A. Saad ___
   Terry A. Saad (lead attorney)
   Texas Bar No. 24066015
   E-mail: tsaad@bosfirm.com
   Jeffrey R. Bragalone
   Texas Bar No. 02855775
   E-mail: jbragalone@bosfirm.com
   Marcus Benavides
   Texas Bar No. 24035574
   E-mail: mbenavides@bosfirm.com
   Brandon V. Zuniga
   Texas Bar no. 24088720
   E-mail: bzuniga@bosfirm.com

**BRAGALONE OLEJKO SAAD PC**
901 Main Street
Suite 3800
Dallas, Texas 75202
Telephone:  (214) 785-6670
Facsimile:  (214) 785-6680

**ATTORNEYS FOR PLAINTIFF**
**EPIC LANE NETWORKS, LP**